RICKY SHIBATA, PERSONAL REPRESENTATIVE OF THE ESTATE OF HELEN M. SHIBATA, DECEASED, APPELLEE, V. COLLEGE VIEW PROPERTIES, A GENERAL PARTNERSHIP, APPELLANT.
449 N.W.2d 544

Filed December 29, 1989.   No. 88-387.

Alan L. Plessman for appellant.

Richard L. Boucher for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Pursuant to verdicts, Ricky Shibata, the plaintiff-appellee personal representative of the estate of Helen M. Shibata, recovered judgment against the defendant-appellant, College View Properties, a general partnership, on behalf of decedent's next of kin for decedent's claimed wrongful death and on behalf of the estate for other damages occasioned by decedent's injuries and the expenses of her funeral. There being merit to College View's assignment that the trial court erred in overruling its motion for dismissal at the close of all the evidence, we reverse and remand with the direction that the cause be dismissed.

The personal representative alleges that College View's negligence caused the 59-year-old decedent to fall down a flight of stairs at a building College View owns and that she died as a consequence. More specifically, the personal representative alleges that College View was negligent in failing to keep the basement stairway lighted, failing to equip the stairway with a

handrail, failing to keep the stairway free of debris, failing to repair or replace the defective latch on the basement door, failing to correct the difference in the stairway floor levels, and failing to post a warning at the entrance to the stairway, and that such negligence proximately caused decedent's injuries and death.

We begin our analysis by recalling that in ruling on a motion to dismiss, the trial court resolves the controversy as a matter of law and may sustain such motion only when the facts are such that reasonable minds can draw but one conclusion. *Goodlett v. Blue Cross, ante* p. 5, 449 N.W.2d 9 (1989); *Lemke v. Northwestern Public Serv. Co.*, 233 Neb. 223, 444 N.W.2d 326 (1989). In considering the evidence for the purpose of ruling on a motion to dismiss, the party against whom a motion is made is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can be reasonably drawn from the evidence; if there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. *Id.*

Similarly, in order to sustain a motion for a directed verdict or for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Cassio v. Creighton University*, 233 Neb. 160, 446 N.W.2d 704 (1989). In considering the evidence for the purpose of ruling on a motion for a directed verdict or for judgment notwithstanding the verdict, the party against whom a motion is made is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can be reasonably drawn from the evidence; if there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. *Id.*

The record establishes that College View owns a commercial building in Lincoln, Nebraska, that it leases a portion thereof to Elizabeth Meyer, and that Meyer operates a retail lingerie shop from the demised premises. Meyer employed decedent as a salesclerk for the shop operation.

Meyer's showroom is roughly rectangular in shape and has a front entrance from the street and a back exit through a solid,

windowless door which swings into a small, straight hallway. This hallway connects the showroom with a larger, L-shaped hallway which provides access to other businesses within the building and to a parking lot behind the building. A door between the two hallways, which has a window covered with plastic, swings into the larger one and can be opened without a key when passing from the smaller hallway into the larger one, but must be unlocked with a key when passing from the other direction. Along the left wall of the smaller hallway as one proceeds from the showroom to the larger hallway, and at a point between the showroom and the door leading into the larger hallway, is a third door which swings into and over the stairway to the basement.

The smaller hallway has no wall windows, but is equipped with a fluorescent light fixture which is activated by a light switch located near the door leading into the showroom. This fixture is usually off during daylight hours because artificial light shines through the window on the door connecting the two hallways. According to a Lincoln Police Department detective, if the light fixtures in the two hallways are off and the doors are shut, the smaller hallway is "fairly dark."

According to Meyer, the door to the basement is supposed to be kept closed during regular business hours but was never locked, although there are two or three locks on the door. There are no warnings or other notices posted on the basement door.

The $1/4$- or $1/2$-inch-thick wooden surface of the smaller hallway floor extends under the basement doorway but ends some 3 or 4 inches short of the edge of the concrete subfloor leading to the top step of the stairway. The stairway itself consists of eight steps, a concrete top step and seven other wooden steps. Each step has an $8^1/2$-inch rise and a $9^3/4$-inch tread. According to an engineer who surveyed the premises, "[The stairway] might be a little bit steeper than some you've seen but it's about average." Along one side of the stairway is a wall, but the other side is open and has no handrail. At the bottom of the stairway is a $2^1/2$- by 4-foot platform which stands $4^1/2$ inches high. The basement floor at the bottom of the stairs is concrete, but at some point the concrete runs out and the rest of the floor is dirt.

There is no light fixture directly over the stairway itself, but a switch along the stairway wall activates a basement light fixture. To reach that switch, it is necessary to lean over or step onto the landing at the top of the stairway. Either the basement light fixture or the smaller hallway light fixture sufficiently illuminates the stairway.

Meyer and College View disagree as to the boundaries of the premises leased to her. Meyer testified that the lease covered only the showroom and not the smaller hallway. However, a College View general partner testified that the premises leased to Meyer included the smaller hallway but not the basement. Neither the lease document nor anything else in the record resolves this conflict. In any event, Meyer had access to the smaller hallway and permitted her employees to use it in order to get from her showroom to the back parking lot. College View did not lease the basement of the building, but did consent to Meyer's use of the basement for storage. However, Meyer told her employees that "they would never need to go down there." There was evidence that one of College View's other lessees also stored materials in the basement.

Meyer planned to keep the shop open until 6 p.m. on the day she last saw decedent alive, March 23, 1987. Decedent arrived for work at 3 p.m. and was to remain until 6 p.m. in order to close the shop; Meyer left the shop at 3:40. Meyer testified that decedent understood the procedure for closing, which involved turning off the cash register and light fixtures and locking the doors. Meyer also stated that she gave decedent instructions for leaving through the back hallways. According to Meyer, normal procedure involved going out the back door of the store, turning on the light fixture in the smaller hallway, shutting the door to the store, going through the door between the two hallways, turning on the light fixtures in the larger hallway if they were not already on, coming back into the smaller hallway to turn off the light fixture in that hallway, and finally exiting out of and closing the door between the two hallways.

Meyer arrived at the shop the following morning at around 9:48 and noticed decedent's automobile parked in the back parking lot in the same position as it had been when Meyer left

the shop the previous day. Meyer unlocked the front door and entered the shop, where she found the shop's overhead light fixtures off, the cash register undamaged, and nothing missing. According to Meyer, there was no evidence of a struggle.

Meyer then went out the back door of her shop and through the two hallways to visit one of the neighboring businesses. The light fixture in the smaller hallway was off, and she did not turn it on. The neighboring shopkeeper testified that when she arrived at the building shortly before 10 a.m. that day, the light fixtures in the larger hallway were off. On Meyer's way back through the smaller hallway, she noticed that the basement door was almost fully open, and she reached in the stairwell to turn on the basement light fixture. Meyer then saw two matching shoes which belonged to decedent and which, according to another witness, had $1/2$- to $3/4$-inch wedge heels. The shoes were lying on adjacent steps approximately halfway down the stairway. A purse Meyer recognized as decedent's was lying on the floor at the bottom of the stairs.

Decedent's body was found 20 to 24 feet from the bottom of the basement stairway. The body was clothed with an outer jacket, which was unzipped; a pair of slacks, which had been partially or completely unzipped; and a blouse, which was completely unbuttoned in front except for one button near the top. The body was without shoes, but did have on nylon stockings. Neither alcohol nor other drugs were detected in decedent's blood, nor was any spermatozoa discovered on the body.

The soles of decedent's stockings were covered with dirt so that "[i]t appeared as though . . . someone [was] walking without their shoes." The back and knees of her slacks and the elbows of her jacket were also covered with dirt. Police discovered blood markings which descended downward on some basement wall paneling close to where decedent was found. According to a Lincoln Police Department detective sergeant, the markings gave "an indication that a person was up right [sic] when that blood was placed there." The blood was found to be "similar" to that of decedent. The keys to decedent's automobile were found about 5 feet from her body, out of her reach.

No identifiable fingerprints were discovered on the basement door or doorknob. Several detectives noticed that the basement stairway was covered with dirt, sawdust, and other debris.

As part of the police investigation of the death, the detective sergeant inspected the basement door and determined that the latching mechanism was not working properly, stating that

when you pulled [the door] shut by use of the handle, you had to hold on to the handle to cause the bolt to engage on the strike plate. If you would push on it from behind, there was a slight pressure from either the frame around the door or from in that small hallway that caused the door not to fully engage with the bolt going into the strike plate.

A Lincoln Police Department detective also inspected the basement door and opined that the door latch was not functioning properly and that if the door were shut without the latch engaging, the door could be pushed open without turning the knob.

Another Lincoln Police Department detective confirmed the foregoing testimony, stating:

I would just pull [the basement door] shut just like you would normally pull a door shut and I would hear a little click and I think it would be latched and I would take my fingertips and I would just push against the door with my hand and it would just push open.

. . . .

. . . It would push open just by touching the middle of the door without touching the knob or anything. It would just push open. It wouldn't be latched securely.

A locksmith, who examined the locks on the basement door, determined that the skeleton key lock on the knob had a "slight catching problem." He explained, "When you turn the knob, it wouldn't catch too much but it would catch only a few times that I tried it at first. After I kept messing with it, it wouldn't stick quite as much." When the knob did catch, the latch would not engage. In his view, the lock should have been replaced on the basement door "because it's an interior-type fire door is what it really is."

College View did not follow any fixed maintenance schedule for the subject building. Specifically, it did not inspect the lock

and latch on the basement door prior to March 23, 1987, to determine whether they were in good repair. Maintenance basically consisted of responding to the tenants' complaints.

The Lancaster County Attorney testified that in his opinion decedent's death was the result of accident. In his words:

> It was pretty clear that [decedent] fell down the stairs and that in that process she injured her head and I believe she fractured one of her legs and there were other injuries. There was an injury to the lungs, I believe, but clearly she fell down the stairs. That would have been the precipitating event that led to her death.

A pathologist testified that in his opinion, based on the autopsy he performed and the investigation his assistant conducted at the scene of the incident, death was caused by "massive head injury sustained in a fall down some stairs" and that the manner of death was accidental. Explaining how he arrived at the conclusion that the death was accidental, the pathologist stated:

> I mean that it's a term of exclusion. I felt that I could confidently exclude that it was not naturally caused and, therefore, it was an unnatural cause and of the unnatural causes, I felt confident based on the information at hand that it was not homicide, it was not suicide and, therefore, it was accidental.

Relying on police suggestions that decedent sustained her injuries at approximately 6 p.m., the pathologist opined that decedent died "at approximately midnight on March the 23rd of 1987." He further testified that in addition to the massive head injuries, decedent also suffered a fracture of her left hip. Finally, the pathologist testified that one of decedent's coronary arteries was narrowed, and, as a result, she might have suffered chest pain which would not be "enough to kill her or give her a heart attack as you ordinarily think of it. But it is enough to give her some chest pain and she may have leaned up against a door and the door went and she stumbled down." The pathologist made clear, however, that he was not saying that such occurred, but only that in concluding the death was not the result of a homicide, he could not "exclude the possibility" that the narrowed artery contributed to the happening.

A neurologist testified that one sustaining massive traumatic head injuries could experience an increase in body temperature. In such a circumstance, one would be expected, during the period of consciousness, to do whatever one could to cool off. This generally involves trying to remove whatever clothing one is wearing.

According to several witnesses, including decedent's gynecologist who saw her on a regular basis, decedent appeared very healthy during the months preceding her death. Meyer did state, however, that decedent had missed 2 weeks from work in January because "her nerves were bad" and that she worked fewer hours after that because of her health, but that when decedent returned to work in January, she appeared rested and healthy. Meyer further testified that decedent did not appear out of the ordinary on the day of her death. One of decedent's friends testified that decedent never mentioned any health problems or that her nerves were bad, but did suffer from the flu sometime in January and a bad cold in early March.

A customer of the lingerie shop, who was assisted by decedent at about 5:10 or 5:15 p.m. on March 23, testified that decedent did not appear confused, distracted, preoccupied, drowsy, or intoxicated.

Much of the foregoing opinion evidence was admitted over College View's objections, and College View urges that its admission was prejudicially erroneous. We do not concern ourselves with that claim, for even if all the questioned evidence was properly admitted, which we do not decide to be the case but for the purposes of our analysis so assume, the personal representative nonetheless failed to establish a prima facie case. This is so irrespective of the boundaries of the premises leased to Meyer and therefore regardless of whether decedent was at any given moment College View's licensee, as the trial court assumed in its instructions, or was College View's invitee.

It is fundamental that in a negligence action the plaintiff must establish that the defendant's negligence was the proximate cause of the damage sued upon. *Hahn v. Weber & Sons Co.*, 223 Neb. 426, 390 N.W.2d 503 (1986). Proximate cause is that cause which, in a natural and continuous sequence, unaccompanied by any efficient intervening cause, produces

the injury, and without which the result would not have occurred. In other words, a defendant's conduct is a proximate cause of an event if the event would not have occurred but for that conduct; a defendant's conduct is not a proximate cause of an event if the event would have occurred without that conduct. See, *Worth v. Schillereff*, 233 Neb. 628, 477 N.W.2d 480 (1989); *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988). The record in this case fails to directly or inferentially establish that any act of claimed negligence on College View's part was a proximate cause of decedent's death. Under the state of this record, the pathologist's speculation that one of the many possible explanations of the incident is that decedent suffered a pain in her chest, leaned against the stairway door, and tumbled down the stairs is, notwithstanding the fact it was stated by a pathologist, pure and simple conjecture. For example, it is just as possible, notwithstanding Meyer's testimony that she told her employees they need never go to the basement, that decedent was in fact going to the basement to retrieve stored materials and, for reasons entirely independent of any one of College View's alleged acts of negligence, lost her balance and fell down the stairs.

The burden of proving a cause of action is not sustained by evidence from which a jury can arrive at its conclusion only by guess, speculation, conjecture, or choice of possibilities; there must be something more which would lead a reasoning mind to one conclusion rather than to another. See, *Mustion v. Ealy*, 201 Neb. 139, 266 N.W.2d 730 (1978); *Wees v. Creighton Memorial St. Joseph's Hospital*, 194 Neb. 295, 231 N.W.2d 570 (1975); *Raff v. Farm Bureau Ins. Co.*, 181 Neb. 444, 149 N.W.2d 52 (1967); *Popken v. Farmers Mutual Home Ins. Co.*, 180 Neb. 250, 142 N.W.2d 309 (1966).

Accordingly, the trial court erred by failing to sustain College View's motion for dismissal made at the close of all the evidence. We therefore reverse the trial court's judgment and remand the cause with the direction that it be dismissed.

REVERSED AND REMANDED WITH
DIRECTION TO DISMISS.