JOHN J. MCVANEY, APPELLANT, V. BAIRD, HOLM, MCEACHEN,
PEDERSEN, HAMANN & STRASHEIM, A PARTNERSHIP, APPELLEE.
466 N.W.2d 499

Filed March 8, 1991.    No. 88-881.

Lawrence L. Marcucci and Edward N. McConnell, of Marcucci, Wiggins & Anderson, P.C., and John M. McHale, of The Peters Law Firm, P.C., for appellant.

Joseph K. Meusey and Robert M. Yates, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HASTINGS, C.J., WHITE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

FAHRNBRUCH, J.

John J. McVaney appeals a directed verdict adverse to him in an attorney malpractice action in which he alleged inter alia that the defendant law firm failed to timely file a negligence action against the Metropolitan Utilities District (MUD).

In directing a verdict at the close of the plaintiff's case in chief for the defendant law firm, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim (Baird), the district court for Douglas County found as a matter of law that McVaney failed to adduce sufficient evidence from which a jury could find that negligence on the part of MUD was the proximate cause of an explosion which destroyed a building McVaney owned. We affirm.

In effect, the trial court held that one of the two experts called to testify by McVaney could not testify to a reasonable degree of certainty that any of the things that MUD did or failed to do was a proximate cause of the explosion and that the second expert's opinion regarding proximate cause was based not upon facts, but impermissibly upon mere conjecture.

On the night of February 5, 1983, a veterinary hospital in Omaha owned by McVaney, who was licensed to practice veterinary medicine at that time, was destroyed by a natural gas explosion. For several days preceding the explosion, McVaney and others reported to MUD that they smelled natural gas in the vicinity of the veterinary hospital. In its normal state, natural gas is odorless, and an odor is introduced into the gas as a safety measure. This odor is commonly referred to as "gas." From January 26 to and including February 4, 1983, MUD employees made several visits to McVaney's property and to the vicinity of the hospital in an attempt to identify and repair any suspected gas leaks.

MUD provided natural gas to McVaney's hospital through a service line from a main in a street to a gas meter located on the west side of McVaney's building. Piping from the meter ran through a wall (wall pipe) and was attached to a fuel line within the hospital's basement. The internal fuel line traversed the basement to the east side, where it was connected by several pipes to a hot water heater and two furnaces. MUD owned the gas meter and the pipe extending from the main in the street to

McVaney's gas meter. The remaining piping, connecting the gas meter to the hospital's internal system, was owned by McVaney.

In the basement of the hospital, there was a partial false ceiling approximately 2 feet below the first floor. The east side of the basement, housing the furnaces and water heater, had no false ceiling. The furnaces and water heater were located in the northeast section of the basement. There was a sound-deadening wall between the furnaces and a series of pens to the west. An exhaust fan, located on the basement's west wall below the false ceiling, was capable of removing 6,000 to 12,000 cubic feet of air per hour from the basement. The basement's volume was 17,400 cubic feet. McVaney testified that the fan in the basement was operating continuously during the 7-day period preceding the explosion.

On January 26, 1983, McVaney smelled gas in a first-floor reception area of his hospital. He relighted the pilot lights of the furnaces and the hot water heater, which were out, and he contacted MUD. On that date, no gas leak was found by MUD personnel, but the gas meter was replaced. On January 31, McVaney again smelled gas in the reception area of his hospital and called MUD. A responding MUD employee discovered a gas leak and tightened a loose pipefitting in the basement of McVaney's building.

On February 2, McVaney detected the odor of gas as he entered his hospital. He telephoned MUD. MUD workers found negligible gas leaks inside McVaney's hospital on February 2, which they attributed to methane gas released by animal wastes. They further reported a Class I leak in the vicinity of a stop box located approximately 100 feet from McVaney's hospital. The stop box was situated underneath the other side of the street from McVaney's building and was not connected to the fuel line inside McVaney's building. According to MUD's procedures manual, a Class I leak is one that "represents an existing or probable hazard to persons or property, and requires immediate repair or continuous action until the conditions are no longer hazardous." An MUD construction crew was dispatched to the site to investigate, and it concluded that the situation was not hazardous and that it did not warrant further attention that night. On February 3, MUD

workers returned to the site, but found no gas leaks.

MUD personnel returned to the vicinity of McVaney's hospital on February 4, after a deputy sheriff reported smelling gas in the area. The MUD workers found a gas leak on a gas service valve across the street, west from McVaney's building. The record is undisputed that this leak would not have affected McVaney's building, which was located on the east side of the street, as the pocket of gas found underneath the west side of the street never migrated beyond the street's east curb.

On February 4, in view of the problems with leaking gas encountered during the week, an MUD employee decided to test the gas service lines to McVaney's hospital. Combustible gas indicator and flame ionization unit tests performed by an MUD crew revealed no leak within the McVaney hospital. Both tests are designed to detect the presence of a gas leak. A soapy solution which bubbles when there is a gas leak was also applied to the wall pipe and the fittings of the gas appliances, but did not disclose the presence of any gas leak.

Gas service to McVaney's building was shut off on February 4 so that the pipes could be pressure tested. This fourth test was conducted on the entire gasline from the main in the street to the valves on the water heater and two furnaces located in the basement of McVaney's building. The test disclosed a loss of pressure, indicating the existence of a leak somewhere in the fuel line between the appliance valves on the hot water heater and two furnaces and the gas meter. The test was conducted twice, with identical results. In accordance with their procedures manual, MUD personnel classified the leak as a Class III leak, which is defined in the MUD manual as "non-hazardous at the time of detection and can be reasonably expected to remain non-hazardous." The leak was "about the size of a pilot light." One of McVaney's two experts testified that such a leak was "insignificant," and McVaney's second expert testified that a leak of that size would not pose a risk of explosion. MUD's investigator, who was called by the plaintiff, testified without reservation that the leak was not hazardous. MUD's engineering and construction manager, who was also called by the plaintiff, testified that the leak was nonhazardous and would reasonably be expected to remain so. There were no

other experts who testified on that point.

On that same day, MUD workers chipped away some concrete from the wall pipe and discovered that the pipe did not have a sleeve, which was due to the owner's construction. Although there was no MUD requirement that a sleeve be in place, MUD personnel were concerned regarding the lack of a sleeve encasing the wall pipe.

The MUD workers intended to return the following Monday to inspect the wall pipe. Before leaving the premises, one of the MUD employees turned on the gas and relighted the pilot lights on the furnaces and water heater.

On the morning of February 5, McVaney smelled gas in the reception area of the building and again that evening when he entered the front door of the hospital. He testified that on the day of the explosion, the odor of gas was no stronger in the evening than it was in the morning. McVaney did not contact MUD regarding the gas odor. During that evening, sometime before midnight, the building exploded.

After the explosion, MUD conducted an investigation to determine the cause of the explosion. The State Fire Marshal's office concurrently investigated the cause of the explosion and, as part of its investigation, subpoenaed MUD's records. An MUD investigator, called to the witness stand by McVaney, testified he discovered two pieces of evidence which led him to conclude that gas was intentionally introduced into the hospital in order to cause the explosion. First, a "dripleg" that should have been screwed onto a "tee" on a pipe attached to the south furnace was missing. A dripleg is a pipe that may catch debris as the fuel is transported through the line. After the explosion, the threads on the pipe to which the dripleg should have been attached showed no visible signs of damage. Despite a search of the immediate area where the dripleg should have been found, it was never located. Regarding the second piece of evidence, MUD's investigator testified that there was high gas consumption in the McVaney hospital in the days preceding the explosion. McVaney was later charged criminally with intentionally burning a building to defraud an insurer, but he was acquitted after a jury trial.

McVaney retained the defendant law firm to assist him in

collecting policy proceeds from his insurance company, which was refusing payment for the loss caused by the explosion. The policy proceeds were eventually recovered by Baird to McVaney's satisfaction.

In his amended petition, McVaney claimed that he entered into an oral contract with Baird to pursue a negligence claim against MUD and that Baird negligently failed to file the claim within the applicable 1-year statute of limitations. See Neb. Rev. Stat. § 13-919 (Reissue 1987) (with some exceptions, a claim against a political subdivision must be filed within 1 year). MUD is a political subdivision. Because of Baird's alleged negligence, McVaney claimed that he was barred from recovery for MUD's alleged acts of preexplosion negligence and negligent postaccident investigation.

McVaney filed a motion for partial summary judgment on the issue of Baird's breach of duty. Baird countered with a motion for partial summary judgment on the issues regarding MUD's postexplosion investigation. The court denied McVaney's motion, but granted Baird's motion. Before trial, McVaney unsuccessfully filed motions in limine to exclude evidence regarding his recovery of insurance policy proceeds and the filing of criminal charges.

At trial, after McVaney rested, Baird moved to strike paragraphs 16(d) and (e) of McVaney's amended petition regarding the reasonableness of Baird's investigation of the explosion and the reasonableness of its actions in general because no expert testimony was presented on these issues. Baird additionally moved for a directed verdict. The court granted the motion to strike and the motion for a directed verdict.

On appeal, McVaney raises a number of assignments of error regarding various rulings made during the course of the trial, including the trial court's alleged error in sustaining Baird's directed verdict motion. Because of this court's determination that the trial court properly directed a verdict against McVaney, we need not set forth or discuss the remaining assignments of error.

## I. INTRODUCTION

As stated, after McVaney rested, Baird moved for a directed

verdict. The court sustained the motion, reasoning that the evidence adduced was insufficient as a matter of law for the jury to find that MUD's alleged negligence was the proximate cause of the explosion at the McVaney hospital. The principal thrust of McVaney's appeal is that the trial court erred in granting a directed verdict.

On appeal from the granting of a motion for a directed verdict, the Supreme Court reviews the evidence in the light most favorable to the party against whom the motion is directed, and that party is entitled to have all controverted facts resolved in his favor and to have the benefit of all inferences which can reasonably be drawn from the evidence. [Citation omitted.]

*Belgum v. Mitsuo Kawamoto & Assoc.*, 236 Neb. 127, 129, 459 N.W.2d 226, 227 (1990). "If there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. [Citations omitted.]" *McCune v. Neitzel*, 235 Neb. 754, 762, 457 N.W.2d 803, 809 (1990). However, when reasonable minds can draw but one conclusion from the facts, the trial court must decide the issue as a matter of law and not submit it to a jury. *Belgum, supra.*

There are three elements a plaintiff alleging attorney negligence must prove: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) that such negligence resulted in and was the proximate cause of loss to the client. See *Stansbery v. Schroeder*, 226 Neb. 492, 412 N.W.2d 447 (1987). A partnership or every member of the partnership is vicariously liable for torts committed by one of the partners acting within the scope of partnership business. *Martinez v. Koelling*, 228 Neb. 1, 421 N.W.2d 1 (1988). See, also, Neb. Rev. Stat. §§ 67-313, 67-315 (Reissue 1990).

## II. ATTORNEY-CLIENT RELATIONSHIP
Baird argues that as a threshold requirement, no attorney-client relationship existed between it and McVaney with respect to a lawsuit against MUD. This argument presents an issue of first impression in this state.

An attorney-client relationship ordinarily rests on

contract, but it is not necessary that the contract be express or that a retainer be requested or paid. The contract may be implied from the conduct of the parties. [Citation omitted.] The relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. [Citation omitted.] In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it. [Citations omitted.]

*Kurtenbach v. TeKippe*, 260 N.W.2d 53, 56 (Iowa 1977). See, also, *George v. Caton*, 93 N.M. 370, 600 P.2d 822 (1979) (no formal contract, arrangement, or attorney fee is necessary to create the relationship of attorney and client; the contract may be implied from the conduct of the parties), *cert. quashed* 93 N.M. 172, 598 P.2d 215; *Woods v. Woods*, 177 Neb. 542, 129 N.W.2d 519 (1964) (a binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties themselves as to all of the details of the proposed agreement, and a contract may be implied from conduct and circumstances). However, "[i]t is necessary to establish that the relationship existed with respect to the act or omission upon which the malpractice claim is based." *Kurtenbach, supra* at 56.

Gerald Laughlin is an attorney and a Baird partner. At the time of the events in question, Laughlin was primarily engaged in trial practice. While Laughlin was unable to classify the types of cases in which he was involved, he was active in commercial and personal injury litigation.

McVaney testified that although he did not enter into an express contract with Laughlin to pursue his negligence claim against MUD, Laughlin was his attorney "and it just flowed like night after day that if I had a problem, [Laughlin] would handle it." In 1983, McVaney and Laughlin discussed McVaney's suit against MUD on at least a dozen occasions.

McVaney testified that he made it clear to Laughlin that he intended to pursue his claim against MUD and provided Laughlin with a list of his alleged damages in the planned lawsuit. In December 1983, Laughlin arranged a meeting for Laughlin, McVaney, and an expert witness to discuss the case. The record reflects a number of notes written in 1983 by McVaney to Laughlin in which the case against MUD is discussed.

In depositional testimony received into evidence, Laughlin stated that almost from the very first time he met with McVaney following the explosion, which was approximately 1 week after the explosion, he believed McVaney wanted him to prosecute a claim against MUD for causing the explosion and that he never informed McVaney that his law firm would not handle a claim against MUD in McVaney's behalf. Nor did Laughlin tell McVaney to seek other counsel in his lawsuit against MUD. Laughlin's deposition further reflects that he was considering the possibility of a lawsuit against MUD and that he discussed with McVaney in a general sense the damages recoverable in such an action. He further conducted preliminary research regarding the problem of causation.

From the foregoing evidence, a reasonable finder of fact could conclude that McVaney sought assistance from Laughlin in his claim against MUD, that the claim against MUD pertained to matters within Laughlin's professional competence, and that Laughlin impliedly agreed to pursue the action against MUD. Furthermore, a reasonable finder of fact could determine that the McVaney-Laughlin relationship existed with respect to the lawsuit against MUD.

## III. BREACH OF STANDARD OF CARE

Having determined that a reasonable finder of fact could find that an attorney-client relationship existed between McVaney and Laughlin with respect to the MUD lawsuit, we next consider whether Laughlin neglected his reasonable duty in failing to timely file the claim against MUD. An attorney " ' "impliedly agrees to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake. .

. ." ' [Citations omitted.]" *Stansbery v. Schroeder*, 226 Neb. 492, 497, 412 N.W.2d 447, 450 (1987). Baird contends that expert testimony was necessary to show the standard of care for attorneys with respect to the statute of limitations and that no expert testimony as to that issue was offered.

Laughlin testified that he was unaware of the applicable statute of limitations and that it was a breach of the standard of care for attorneys in Omaha, Nebraska, to not be aware of the 1-year statute of limitations for filing claims against political subdivisions. In its second amended answer, Baird admitted that MUD was a political subdivision. By way of depositional testimony, Laughlin further related that it was a breach of the standard of care for attorneys in Omaha, Nebraska, not to inform a client that he or she had 1 year in which to file a claim against MUD. Laughlin testified at trial that he did not have knowledge of the statute of limitations until McVaney informed Laughlin that McVaney had been advised by another attorney that the statute of limitations had run.

In this case, no outside expert testimony was necessary because Laughlin's testimony established a lawyer's standard of care respecting a statute of limitations. Upon review of the evidence, it is plain that a reasonable finder of fact could conclude that Laughlin, in failing to timely file an action against MUD for McVaney, breached his duty of care.

## IV. PROXIMATE CAUSE

In a malpractice action against an attorney, a plaintiff has the burden of proving that he or she would have been successful in obtaining and collecting a judgment in the action for which he or she contracted with an attorney and that he or she was prevented from doing so by the attorney's negligence. See *Eno v. Watkins*, 229 Neb. 855, 429 N.W.2d 371 (1988). Thus, McVaney not only must demonstrate by a preponderance of the evidence Laughlin's malpractice, but also the negligence of MUD in the underlying action. The elements of a negligence cause of action are duty, breach, proximate cause, and damages. See *Widga v. Sandell*, 236 Neb. 798, 464 N.W.2d 155 (1991).

The central issue in this case is whether MUD's alleged

negligence was the proximate cause of the explosion in McVaney's building. The trial court held that expert testimony was necessary to demonstrate proximate cause and that based upon the testimony of the plaintiff's two expert witnesses, the jury would be required to speculate as to the cause of the explosion. With respect to the underlying lawsuit against MUD, the parties have limited their discussion on appeal to the issue of proximate cause. It is assumed arguendo that duty, breach, and damages were adequately pled and proved.

Standing alone, the fact that a gas explosion due to a leak has occurred is not sufficient to demonstrate that a gas distributor's negligence was the proximate cause of the explosion. See *Reed v. Metropolitan Utilities Dist.*, 173 Neb. 854, 115 N.W.2d 453 (1962). The foregoing rule may be modified in some cases by the doctrine of res ipsa loquitur, which permits the issue of liability to become a jury question. See *Beatty v. Davis*, 224 Neb. 663, 400 N.W.2d 850 (1987). However, the res ipsa loquitur doctrine is inapplicable if specific acts of negligence are alleged or there is direct evidence of the precise cause of the accident. *Id.* In this case, McVaney alleged specific acts of negligence on the part of MUD in his amended petition and attempted at trial to demonstrate the precise cause of the accident.

In resolving the proximate cause issue, this court is guided by the following principles. A plaintiff is not bound to exclude the possibility that the accident might have happened in some other way, but is only required to satisfy the jury, by a preponderance of the evidence, that injury occurred in the manner claimed. See *Driekosen v. Black, Sivalls & Bryson*, 158 Neb. 531, 64 N.W.2d 88 (1954). "The burden of proving a cause of action is not sustained by evidence from which a jury can arrive at its conclusion only by guess, speculation, conjecture, or choice of possibilities; there must be something more which would lead a reasoning mind to one conclusion rather than to another." *Shibata v. College View Properties*, 234 Neb. 134, 143, 449 N.W.2d 544, 550 (1989).

Negligence, like any other fact, may be proved by circumstantial evidence. This is evidence of one fact, or of a set of facts, from which the existence of the fact to be

determined may reasonably be inferred. . . . Thus it may be reasonable to infer . . . from the fact that soon after the passage of a train a fire started up beside the track, that it was caused by negligence in controlling sparks from the train.

Prosser and Keeton on the Law of Torts, *Negligence: Proof* § 39 at 242-43 (5th ed. 1984). See, also, *Hahn v. Weber & Sons Co.*, 223 Neb. 426, 390 N.W.2d 503 (1986) (while circumstantial evidence may be used to prove causation, the evidence must be sufficient to fairly and reasonably justify the conclusion that the defendant's negligence was the proximate cause of the injury to the plaintiff).

We agree with the trial court that expert testimony was necessary to show that MUD's negligence was the proximate cause of the explosion at the McVaney hospital. In *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990), this court held with respect to the requirement of expert testimony that the test is whether the particular issue can be determined from the evidence presented and the common knowledge and usual experience of the fact finders. As the remaining discussion demonstrates, the issue of causation of the explosion in McVaney's building was highly technical and not within the common knowledge and usual experience of a factfinding jury.

In order for gas to explode, two requirements are necessary: a sufficient ratio of gas to the atmosphere and an ignition source. For a natural gas explosion, the percentage of gas to air cannot be below 5 percent or above 15 percent.

In the early morning hours following the explosion, an MUD investigator recovered the wall pipe and found that it was corroded. The record reflects that the wall pipe had a $1/8$-inch hole, a crack, and another small hole. It was McVaney's theory that the wall pipe was the source of the gas leak which caused the explosion and that MUD was negligent with respect thereto. As stated, MUD's investigator theorized that the dripleg was intentionally removed to introduce gas into McVaney's hospital and that a candle or some other source within the building ignited the gas. During his case in chief, in addition to calling MUD's experts, McVaney presented the testimony of his own two experts to prove causation.

Keith Naeve, a consulting engineer having experience in investigating natural gas explosions, testified that the most significant act of preexplosion negligence by MUD occurred when its crew left McVaney's hospital on Friday evening after discovering a small, insignificant gas leak, but failing to find its source or to repair it. Naeve testified that although the leak was small when discovered, "it *may* have been something that *could* increase in time based upon environmental factors and become a hazardous leak at a later date." (Emphasis supplied.) Naeve stated that in chipping away the mortar and concrete on the exterior wall in order to inspect the wall pipe, the *likelihood* was increased that the corroded wall pipe could be flexed or bent and leak. During cross-examination, Naeve admitted that he could not testify to a reasonable degree of certainty that any of the things that MUD did or failed to do was a proximate cause of the explosion. Naeve's testimony dealt only in possibilities as to whether any negligence on the part of MUD proximately caused the explosion in McVaney's building. A proximate cause of an explosion is not sustained by evidence from which a jury can arrive at such a conclusion only by guess, speculation, conjecture, or choice of possibilities. See *Shibata v. College View Properties*, 234 Neb. 134, 449 N.W.2d 544 (1989). Therefore, Naeve's testimony could not serve as a basis for a jury to determine that the explosion was proximately caused by negligence on the part of MUD. The trial court was correct in not permitting the jury to speculate on the proximate cause of the explosion or base a plaintiff's verdict on that issue upon Naeve's testimony.

McVaney also called as an expert Dr. Stanley Clark, chairman of the agricultural engineering department at Kansas State University. He testified that he had experience in determining causes of gaseous explosions. However, this case was the first time in which Dr. Clark investigated a natural gas explosion.

It was Dr. Clark's opinion that the largest hole in the wall pipe leaked approximately 42 cubic feet of gas per hour and that gas accumulated in the space above the false ceiling and was ignited by the pilot lights in the furnaces. On cross-examination, Dr. Clark testified that he did not know when the hole in the wall

pipe began to occur. Because the space above the false ceiling comprised 1,100 cubic feet, Dr. Clark concluded that the wall pipe could have produced a combustible mixture of gas and air in less than 3 hours, keeping in mind that gas will not explode unless it constitutes 5 to 15 percent of the air. Dr. Clark testified that although gas is lighter than air, the gas would reach the ignition source because a pressure differential would create the possibility of air's descending to the ignition source and the gas would naturally diffuse out into an open area. In this case, the open area would be the area above which there was no suspended ceiling and in which the gas appliances were located. He further asserted that air is drawn to a furnace because of consumption of air by the burners and by the furnace's vent pipe.

There was testimony that when the fan was operating, a much larger leak was required before the gas reached its explosive limit. As recalled, the fan was capable of removing 6,000 to 12,000 cubic feet of air per hour from the basement. Logic would dictate that the gas would be removed from the basement before it reached its explosive limit. However, there was testimony that not "every little piece of volume in this whole volume of the basement is exchanged every so often" and that the exchange rate would be even lower above the suspended ceiling. There was also testimony that although an explosive limit might not be reached in a structure as a whole, pockets of gas within a building can reach an explosive limit. Dr. Clark testified that the basement fan on the west wall would have removed only a very small fraction of the air in the space above the false ceiling and that a sound-deadening wall between the gas appliances and the fan would lessen the effect of the exhaust fan in that area of the basement.

Dr. Clark testified that the pilot lights of the furnaces were the ignition source. He further testified that for his hypothesis to be viable, the dripleg had to be in place on the south furnace at the time of the explosion because if the dripleg was removed, the furnace pilot lights would almost surely extinguish. Although Dr. Clark appears to have relied on the furnaces' pilot lights as the ignition source, he also testified, "We have a decreased pressure in this zone and so the gas could sort of come

down into this region where the pilot lights were located, and there were pilot lights on both furnaces and also on the *water heater*." (Emphasis supplied.) A good faith conflict due to self-contradiction of an expert's opinions presents a question to be resolved by the trier of fact. *Vredeveld v. Gelco Express*, 222 Neb. 363, 383 N.W.2d 780 (1986). Therefore, taking nothing else into consideration, a reasonable finder of fact could determine that the water heater's pilot light provided the ignition for the gas. However, this still does not mean there was sufficient evidence to submit the case to the jury.

While arguments regarding the fan and ignition source are not fatal to McVaney's claim, his theory of causation is inconsistent with the indisputable physical evidence in this case. Without resort to outright speculation, McVaney's proof on the issue of causation simply fails to account for the missing dripleg and the exorbitant consumption of gas at his hospital prior to the explosion.

Without contradiction, the postexplosion investigation revealed that the dripleg which should have been attached to a pipe on the south furnace was missing. Dr. Clark theorized that the dripleg became disengaged due to the explosion. He admitted that the threads on the pipe to which the dripleg was attached did not show any visual damage. Dr. Clark further conceded that if the dripleg was screwed in tight and threaded properly, there would be trauma to threads caused by the separation during the explosion. Dr. Clark attempted to explain the absence of damage to the threads by speculating that the missing dripleg was loose or short-threaded or that there may have been damage to the thread that only microscopic tests would reveal. There was no physical or scientific evidence of any such damage.

It is uncontroverted that the dripleg was in place on Friday, when MUD, for the last time prior to the explosion, departed McVaney's veterinary hospital. The MUD worker who relighted the pilot lights of the furnaces and water heater reported that there was no gas consumption registered by the gas meter's test hand when the gas was turned off. That would not have been the case had the dripleg been removed. The worker smelled no gas odor, nor did he hear a hissing sound of

escaping gas when he relighted the pilot lights of the two furnaces and the water heater. If the dripleg had not been attached, it is undisputed that the furnace pilot lights could not have been relighted by the MUD employee. Furthermore, Dr. Clark testified that if the dripleg had been attached loosely enough to fall off, the various procedures followed by MUD would have detected any leak. The evidence is undisputed that procedures did not detect any leak attributed to the manner in which the dripleg was fastened.

Another major problem with attributing the explosion to a leak from the wall pipe is the inordinate amount of gas that flowed through the meter. Assuming that the furnaces and water heater were operating at maximum capacity, it is undisputed that 10,680 cubic feet of gas in excess of that necessary to operate the two furnaces and water heater at maximum capacity was consumed from January 31 to February 5. Dr. Clark testified that based on the size of the hole in the wall pipe (discovered after the explosion) and considering his view of the pressure, the larger hole in the wall pipe could leak 42 cubic feet of gas per hour. McVaney's other expert testified that the large hole would have leaked well beyond 50 cubic feet per hour. At those rates, it would have taken between 8 and 10 days for the 10,680 cubic feet of gas to escape from the larger hole in the wall pipe. There is no evidence by any expert as to the extent of any leak due to a lesser hole or crack in the wall pipe or the leak repaired on January 31. Furthermore, the leak discovered on February 4 was leaking at a rate of only 2 cubic feet per hour, and although the wall pipe was sheared off due to the explosion, this could at most account for 722 cubic feet of gas. Thus, the proven leaks and the alleged wall pipe leaks would account for far less than 10,680 cubic feet of gas.

Dr. Clark testified that if the wall pipe had been leaking at the rate of 42 cubic feet per hour on February 4, the testing by MUD employees on that date would have detected the leak. McVaney's other expert, Naeve, testified that if a leak caused the explosion, it had to develop sometime between the time the MUD crew left McVaney's hospital on Friday and the time of the explosion on Saturday evening.

Naeve further testified that the missing dripleg provided a

gas leak which explained the meter reading of excessive gas use. It is undisputed that the gas meter was accurate to within 0.07 percent. As previously stated, the dripleg was in place when the MUD employees left the McVaney building on Friday.

In the absence of mere conjecture, the only possible explanation for the missing dripleg is that it was removed after the MUD employees left the hospital, but before the explosion. Dr. Clark's expert opinion as to the proximate cause of the explosion is based not upon fact, but conjecture. When an expert opinion is given which is not in accordance with the actual facts, it lacks probative value. *Latek v. K Mart Corp.*, 224 Neb. 807, 401 N.W.2d 503 (1987). See, also, *City of Lincoln v. Jordan*, 131 Neb. 879, 270 N.W. 508 (1936) (the opinion of experts cannot prevail over actual facts).

## V. CONCLUSION

From a thorough review of the record, it is clear that as a matter of law, McVaney failed to adduce sufficient evidence from which a jury could properly find that any negligence on the part of MUD was the proximate cause of the explosion at the plaintiff's veterinary hospital. To find that negligence on the part of MUD was the proximate cause of the explosion at the hospital would have required the jury to reach such a conclusion by guess, speculation, conjecture, or choice of possibilities. The trial court properly directed a verdict for the defendant.

AFFIRMED.

CAPORALE, J., not participating.