RONALD PATTERSON AND CAROL PATTERSON, APPELLANTS AND CROSS-APPELLEES, V. SWARR, MAY, SMITH & ANDERSON, A PROFESSIONAL CORPORATION, ET AL., APPELLEES AND CROSS-APPELLANTS.

473 N.W.2d 94

Filed August 16, 1991.   No. 89-436.

Michael A. Patrick and David W. Griffith, of Williams, Trine, Greenstein & Griffith, P.C., for appellants.

John W. Wilke and Clark J. Vanskiver, of Sodoro, Daly & Sodoro, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Complaining that the trial court erred in granting the defendant lawyers a new trial, the appellants, Ronald Patterson and his wife, Carol Patterson, request that this court reinstate a $1,114,600 legal malpractice jury verdict in their favor.

In their petition, the Pattersons alleged that the defendant attorneys negligently represented them in their chapter 11 bankruptcy reorganization.

After the jury verdict was returned, the district court for Douglas County granted a new trial because of Ronald Patterson's testimonial reference to the defendants' having insurance.

By cross-appeal, the defendants, consisting of Swarr, May,

Smith & Anderson, a professional corporation, and lawyers Thomas D. Stalnaker and James T. Gleason, as individuals, claim that the trial court erred in overruling their motions for a directed verdict and for judgment notwithstanding the verdict.

The trial court correctly determined that Ronald Patterson's testimony regarding the defendants' insurance was prejudicial error, but because of the plaintiffs' failure of proof on the element of damages, the defendants' motions for directed verdict and for judgment notwithstanding the verdict should have been sustained. Therefore, the cause is remanded to the district court with directions to dismiss the case.

Near Gretna, Nebraska, the Pattersons engaged in farming, ranching, and land development operations. The Pattersons began breeding purebred Brangus cattle in approximately 1978. Ronald Patterson (hereinafter Patterson) testified that at that time, he understood that it would take 5 to 7 years before the cattle operation would be productive. To finance their cattle business, the Pattersons borrowed money from the Bank of Papillion (hereinafter bank). Patterson testified that by the end of 1983, the Pattersons' loan with the bank was in excess of $700,000. A note for that amount was secured by livestock, machinery, and crops. The record further reflects that the Pattersons gave the bank another note for the sum of $100,000 on September 16, 1983, which was payable on March 14, 1984. The $100,000 note was secured by certain parcels of the Pattersons' real property. Although the Pattersons had a number of other secured and unsecured creditors, the Pattersons owed the bank nearly 10 times the amount owed any other one creditor. In late 1983, the bank's larger note came due. In January 1984, the bank demanded that the note be fully paid. Apparently, it was the bank's position that the value of its security was less than the amount of the debt owed to it by the Pattersons. In that same month, the bank filed a replevin action to take possession of the personal property which secured the Pattersons' bank debt.

During all relevant times, Stalnaker and Gleason were practicing attorneys in Omaha, and they were associated with the law firm of Swarr, May, Smith & Anderson. Stalnaker and Gleason were employed by the Pattersons to represent them in

their bankruptcy action. On February 9, 1984, the Pattersons filed a voluntary petition for reorganization under chapter 11 of the U.S. Bankruptcy Code. Stalnaker and Gleason explained at the malpractice trial that the purpose of a chapter 11 bankruptcy is to allow a debtor with financial difficulties to accommodate the debtor's creditors and be able to reorganize and continue to operate the debtor's business. Upon the filing of the bankruptcy petition, the bank's replevin action was automatically stayed by the bankruptcy code. See 11 U.S.C. § 362 (1982).

Patterson testified that from the commencement of the bankruptcy action, he and his wife were instructed by Stalnaker to establish a separate checking account, to sell crops and cattle, and to use the proceeds therefrom for anything in the ordinary course of their business. "Cash collateral" is defined in the U.S. Bankruptcy Code as "cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a) (1982). There was testimony that in the context of a farm bankruptcy, cash collateral is the proceeds obtained from the sale of secured crops and secured livestock, which in this case was pledged to the bank. The Pattersons used the bank's cash collateral for cattle, farm, and miscellaneous expenses. Both Stalnaker and Gleason testified they told Patterson that the proceeds could be used to keep the cows alive during the winter. Stalnaker testified that because the bank acknowledged the necessity of keeping the Pattersons' cattle alive, it tacitly agreed to their use of cash collateral to do so.

On May 9, 1984, Gleason informed the Pattersons of the need to devise a reorganization plan or, as an alternative, to reach an agreement with the bank. A reorganization plan was formulated and filed with the bankruptcy court on June 8, 1984. At the malpractice trial, there was expert testimony that the plan "was really pretty good" and that there were no impediments to its confirmation. The reorganization plan provided a method by which the Pattersons' secured and unsecured creditors, including the bank, would be repaid. The terms of the plan will be more fully discussed in part II of this opinion.

On October 18, 1984, the bank moved to have the automatic

bankruptcy stay lifted. The bankruptcy court lifted the stay on November 15, 1984, after finding that the Pattersons "in this proceeding [have] spent $70,000 of cash collateral in direct violation of the [bankruptcy] statute." The U.S. Bankruptcy Code in relevant part prohibits the spending of cash collateral without a creditor's consent or a bankruptcy court's authorization. See § 363(c)(2). Because the Pattersons' chapter 11 reorganization bankruptcy remained pending even though the stay had been lifted, the Pattersons were still subject to § 363(c)(2) and therefore continued to be legally barred from using cash collateral without creditor consent or bankruptcy court approval. The Pattersons were not represented by the defendants in any bankruptcy proceedings after the lift-of-stay hearing.

With the lifting of the stay, the bank was free to pursue a creditor's remedies, such as replevin and foreclosure. On November 19, 1984, the bank's lawyer wrote to the defendants, asserting that the bank would forbear from immediate replevin and foreclosure actions if the Pattersons, among other actions, would release the cattle to the bank for a disbursal sale. The Pattersons' herd consisted of 485 head in November 1984.

The bank subsequently obtained a replevin order. Thereafter, the bank and the Pattersons entered into negotiations, and the Pattersons began liquidating their herd of cattle in May 1985, with the bank's consent. In September of that same year, the Pattersons and the bank reached an agreement and stipulation whereby the Pattersons executed releases to the bank, made cash payments to the bank, conveyed to the bank by warranty deed certain real estate, and gave two notes to the bank, one in the amount of $275,000 and the other in the amount of $65,000. Upon the Pattersons' compliance with the agreement and stipulation, the bank agreed in substance that the Pattersons would be deemed released and discharged from all debt obligations to the bank.

After the stay was lifted, a different reorganization plan was confirmed. That plan incorporated the 1985 Patterson-bank agreement. The agreement provided that if the Pattersons defaulted on their obligations under the agreement, the bank could proceed with foreclosure or replevin.

After the Patterson-bank agreement was executed, the Pattersons continued to liquidate their herd of cattle to meet their obligations under that agreement. A payment required by the agreement came due on December 1, 1987. The Pattersons were unable to make that payment. Two weeks later, the bank filed a replevin action. In July 1988, the bank seized the Pattersons' remaining cattle and equipment. The Pattersons were able to repurchase six head of cattle, which they still possessed at the time of the malpractice trial. With respect to several parcels of real estate, the bank either foreclosed or exercised its rights under a trust deed. Patterson testified that at the time of trial, he owned the following real estate parcels: 160 acres, 77 acres, and a one-third interest in 280 acres. There was evidence that the real estate owned by the Pattersons at the time of trial had a net worth of $375,000 to $400,000. There was further evidence that at the time of trial, the Pattersons were not indebted to the bank.

On February 4, 1986, the Pattersons filed this action against the defendants. They alleged that because of the negligent advice they received regarding the disposition of the proceeds received from the sale of the bank's collateral, they were deprived of their ability to effectively reorganize under chapter 11 and, thereby, directly suffered losses.

The defendants' motion for directed verdict made at the conclusion of the Pattersons' case in chief was overruled. At the close of all the evidence, the defendants renewed their motion for directed verdict, which motion was also overruled. On February 17, 1989, the jury returned a verdict in the sum of $1,114,600 in favor of the Pattersons. The defendants, on February 23, 1989, filed a motion for judgment notwithstanding the verdict and a motion for a new trial. On April 11, 1989, the trial court overruled the defendants' motion for judgment notwithstanding the verdict, but vacated the judgment in favor of the Pattersons and granted a new trial. A timely notice of appeal was filed in the district court on May 9, 1989, and the defendants cross-appealed.

## I. INSURANCE
The defendants made a motion in limine to prevent

Patterson from referring to the defendants' having insurance. The court overruled the motion, but cautioned Pattersons' counsel that "getting into that may affect the case."

Patterson testified that immediately after the bankruptcy court lifted the stay, Gleason stated to him: "Ron, we have really screwed this thing up. . . . Sue the 'h' out of us and we got insurance and get yourself a lawyer." The defendants moved for a mistrial on the ground that Patterson "advised in his . . . answer to the Court that the defendants had insurance."

In one of their propositions of law, the Pattersons suggest that the defendants failed to object to the insurance reference. However, no antecedent objection is necessary in order to move for a mistrial. See, *State v. Archbold*, 217 Neb. 345, 350 N.W.2d 500 (1984); *Motis v. Manning*, 200 Neb. 593, 264 N.W.2d 844 (1978).

The trial court overruled the motion for a mistrial and stated that the issue could be raised after a verdict was entered. During the defendants' case in chief, Gleason denied that he told Patterson to "sue the 'h' out of [him.]" After the judgment was entered, the defendants' timely motion for a new trial was sustained on the basis of Patterson's reference to insurance.

The plaintiffs contend that the trial court erred in granting a new trial. "The standard of review of an order granting a new trial is whether the trial court abused its discretion." *Kumar v. Douglas County*, 234 Neb. 511, 516, 452 N.W.2d 21, 24 (1990).

Over 50 years ago, this court announced the following rule:

> [W]here the plaintiff shows that defendant carries liability insurance, when it is not relevant to some issue in the case, we have come to the conclusion that it is inadmissible. . . . [I]f the evidence is properly admissible for any purpose, it cannot be excluded for the reason that it tends to prejudice the defendant because it shows or tends to show that he carries liability insurance.

*Fielding v. Publix Cars, Inc.*, 130 Neb. 576, 579-80, 265 N.W. 726, 728 (1936).

The essence of that rule has been codified at Neb. Rev. Stat. § 27-411 (Reissue 1989). Section 27-411 provides:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted

negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

The Pattersons argue that the statement concerning insurance was a necessary part of Gleason's admission. Severing the statement that the defendants had insurance, Gleason's statement reads: "Ron, we have really screwed this thing up. . . . Sue the 'h' out of us . . . and get yourself a lawyer." The fact that the defendants had insurance adds nothing to Gleason's admission of fault. Therefore, its only purpose was to inject into the trial the prejudicial fact that the defendants had insurance.

The Pattersons also claim that Gleason's statement regarding insurance made his admission more credible and was, therefore, relevant for that purpose. Gleason's statement was elicited during the Pattersons' case in chief. It was not until the defendants' case in chief that Gleason denied that he told Patterson to sue him and Stalnaker. Credibility of the admission was not put in issue until that later point in time. Therefore, it was not proper for the plaintiffs to bolster Gleason's admission with the statement regarding insurance when credibility of the admission was not yet in issue.

Finally, the Pattersons claim that if any error was committed in admitting the evidence of Gleason's insurance, it was not prejudicial. "A motion for new trial should be granted only where there is error prejudicial to the rights of the unsuccessful party." *Kumar, supra* at 516, 452 N.W.2d at 24. In view of the balanced evidence presented on the issues of proximate cause and damages and the clear reference to the defendants' liability insurance, it cannot be said that the trial court abused its discretion in granting a new trial on the basis of the evidence of the defendants' insurance. This assignment of error complaining that the trial court erred in granting a new trial is without merit.

## II. ATTORNEY MALPRACTICE

In their cross-appeal, the defendants claim that the trial

court erred in overruling their motions for directed verdict and for judgment notwithstanding the verdict.

On a motion for directed verdict or judgment notwithstanding the verdict, "the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences which can reasonably be deduced therefrom." [Citations omitted.]

*McCune v. Neitzel*, 235 Neb. 754, 762, 457 N.W.2d 803, 809-10 (1990). "[I]n order to sustain a motion for a directed verdict or for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion." *Shibata v. College View Properties*, 234 Neb. 134, 136, 449 N.W.2d 544, 546 (1989). In a negligence case, a trial court should sustain a motion for directed verdict or for judgment notwithstanding the verdict only when the evidence, viewed in the light most favorable to the party against whom the motion is directed, fails to establish actionable negligence. *Griess v. Borchers*, 161 Neb. 217, 72 N.W.2d 820 (1955). As an element of a negligence cause of action, a plaintiff must prove damages, *McVaney v. Baird, Holm, McEachen*, 237 Neb. 451, 466 N.W.2d 499 (1991), with reasonable certainty, *Uryasz v. Archbishop Bergan Mercy Hosp.*, 230 Neb. 323, 431 N.W.2d 617 (1988).

"There are three elements a plaintiff alleging attorney negligence must prove: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) that such negligence resulted in and was the proximate cause of loss [damages] to the client. [Citation omitted.]" *McVaney, supra* at 458, 466 N.W.2d at 506.

An attorney-client relationship is created when a person seeks advice or assistance from an attorney, the advice or assistance sought pertains to matters within the attorney's professional competence, and the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. *Id.* It is uncontroverted that the Pattersons sought

professional assistance from Stalnaker and Gleason and that the defendants in fact represented the Pattersons in their bankruptcy action.

The Pattersons adduced evidence that the defendants breached their duty of care. A bankruptcy attorney, testifying as an expert, said that the defendants' advice to the Pattersons to use cash collateral from the onset of the filing of the Pattersons' bankruptcy continuing through the lifting of the stay did not meet the applicable standard of care for a bankruptcy attorney.

Upon the determination that there was evidence of the defendant attorneys' employment and their neglect of a reasonable duty, the sole remaining issue is whether there was evidence that such negligence resulted in and was the proximate cause of damage to the Pattersons. The defendants contend that the Pattersons failed to make a prima facie showing of damage because in adducing evidence in regard to their alleged loss the Pattersons departed from the reorganization plan proposed by the defendants.

"In a negligence case . . . the proper measure of damages is that which will place the aggrieved party in the position in which he or she would have been had there been no negligence. [Citations omitted.]" *Stansbery v. Schroeder*, 226 Neb. 492, 496, 412 N.W.2d 447, 450 (1987) (attorney malpractice case). In the instant case, it was necessary for the Pattersons (1) to show that the reorganization plan proposed by the defendants would have been confirmed by the bankruptcy court and (2) then to show their damages with reasonable certainty by comparing their expected financial position upon the completion of the reorganization plan proposed by the defendants with their actual financial condition at that same point in time. The Pattersons do not argue on appeal that the defendants should have proposed a different plan.

A bankruptcy lawyer who testified as an expert opined that the plan proposed by the defendants was feasible and would have been confirmed. The defendants' proposed plan provided in relevant part that "[d]uring a five year period beginning with the effective date of the Plan, the Debtors [Pattersons] shall liquidate, in an orderly manner, all livestock owned by them,

provided, however, that Debtors shall have the option to retain a maximum of 40 head of cattle."

The Pattersons' evidence on the issue of damages was presented through the expert testimony of Patricia Pacey, an economist. Pacey calculated a method allegedly allowed by the plan by which the Pattersons could generate revenue from the sale of some of the cattle and crops, offset by their expenses. Pacey admitted that in calculating revenue from the sale of cattle, she determined that the Pattersons would retain most of their herd and that maintenance of a number of head of cattle was necessary in order to meet expenses and the obligations under the proposed plan. She testified that she assumed that the Pattersons, starting in 1986 or 1987, would have a minimum of 238 heifers. During direct examination, Pacey admitted that she departed from the proposed plan in that the defendants' reorganization plan provided for a substantially larger percentage of cattle to be sold. She further stated that the projected revenue would be decreased by a reduction in the size of the herd. At the termination of the proposed plan, Pacey projected a cattle herd of 430 head, as opposed to the retention of not more than 40 head of cattle as set forth in the defendants' plan. Pacey testified that if the Pattersons had been able to proceed under the proposed plan as she interpreted it, they would have been able to completely repay their indebtedness to their creditors, including interest. Pacey further testified that under her reading of the proposed plan, the Pattersons incurred damages of $1,114,600 because they were unable to proceed under the plan as she interpreted it. Although Patterson himself testified as to the damages suffered by the failure to implement the proposed plan, his testimony was based on Pacey's projections.

The defendants unsuccessfully made a motion in limine to Pacey's testimony on the ground that it was speculative, and the court granted a continuing objection to her testimony. The court further overruled the defendants' motion to strike Pacey's testimony. With respect to Pacey's testimony, the defendants' motions for directed verdict and for judgment notwithstanding the verdict were also overruled.

In calculating damages, Pacey departed substantially from

the defendants' proposed reorganization plan. In doing so, she failed to show that the Pattersons' damages were the proximate result of the defendants' negligence. Pacey candidly admitted that she did not follow the plan in determining the size of the Pattersons' cattle herd. In changing that crucial factor, revenue was increased, which would have allowed the plaintiffs to meet their expenses, repay their creditors, and retain their assets. In essence, Pacey devised a new plan whereby the Pattersons would have retained their cattle herd, real estate, and equipment. However, there was no expert testimony that such a plan was ever confirmed, nor was there expert testimony that the plan would be confirmed by the bankruptcy court or that such a plan was even proposed. "When an expert opinion is given which is not in accordance with the actual facts, it lacks probative value. [Citations omitted.]" *McVaney v. Baird, Holm, McEachen*, 237 Neb. 451, 468, 466 N.W.2d 499, 511 (1991). "If the assumption for an opinion advanced by an expert witness is not true, such opinion lacks probative value and should be rejected as irrelevant. [Citation omitted.]" *Turner v. Welliver*, 226 Neb. 275, 284, 411 N.W.2d 298, 305 (1987).

In support of Pacey's testimony, the Pattersons point to the testimony of Harry Sterling, who was one of the Pattersons' expert bankruptcy witnesses. Sterling testified that in terms of the assumptions used and the economic model constructed, Pacey's projections were *substantially* identical to the plan proposed by Stalnaker in June 1984. He further testified:

> If the economics of this plan would have been such that the creditors would be paid off and retention of more than forty head was possible or likely under the economics of the way the business went, you don't have to liquidate all the way down, and if things go better you can modify the plan, but assuming that things go well and you pay the creditors off under the plan's provisions like that, which is contained in the means of execution, are not strictly enforced.

First, Sterling's testimony lacks the requisite certainty required of expert testimony, as it speaks to purely hypothetical possibilities. Second, the Pattersons in effect contend that

Pacey did not depart from the defendants' proposed reorganization plan because Sterling says she did not. A reading of the proposed plan clearly reveals that Pacey did not comply with the plan in arriving at her proposed damages, regardless of Sterling's testimony. It would be a strange proposition indeed if a court were required to assume an expert witness' testimony was based on facts in evidence for the sole reason that another expert said it was.

The Pattersons further contend that Pacey did not amend the plan because the plan was open-ended and did not provide an exact timeframe for liquidation of the cattle herd. Although the proposed plan did not provide the exact method by which the Pattersons were required to reduce their herd, it did mandate that at the end of the 5-year period, the herd was to be liquidated, with the Pattersons having the option of retaining 40 head of cattle. As discussed, Pacey projected a cattle herd of 430 head upon the completion of the plan, not 40 head of cattle as required by the plan. This, in turn, allowed her to project sufficient revenue over the life of the plan to satisfy the Pattersons' indebtedness and preserve their assets. Pacey's estimate of damages was improperly based upon guess, speculation, conjecture, or choice of possibilities. See *McVaney, supra.* In departing from the proposed reorganization plan, the Pattersons' evidence failed to show the position in which they would have been had there been no negligence. Disposition of this issue makes it unnecessary to reach the defendants' other contentions.

The Pattersons failed as a matter of law to show with reasonable certainty what damages proximately resulted from the defendants' negligence. Thus, the cause must be remanded to the district court with directions to dismiss.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED WITH DIRECTIONS TO DISMISS.