SPORTS COURTS OF OMAHA, LTD., A NEBRASKA LIMITED PARTNERSHIP, APPELLANT, V. SAM R. BROWER AND ANDERSEN BERKSHIRE LAURITSEN & BROWER, APPELLEES.

534 N.W.2d 317

Filed June 30, 1995. No. S-93-798.

Daniel E. Klaus and Donald L. Dunn, of Rembolt Ludtke Parker & Berger, for appellant.

Dean F. Suing and David A. Castello, of Katskee, Henatsch & Suing, for appellees.

WHITE, C.J., CAPORALE, FAHRNBRUCH, WRIGHT, and CONNOLLY, JJ.

PER CURIAM.

The plaintiff–appellant, Sports Courts of Omaha, Ltd., alleges that it sustained damage as the result of the negligence of its attorneys, the defendants–appellees, Sam R. Brower and the partnership of which he is a member, Andersen Berkshire Lauritsen & Brower, in permitting the dismissal of Sports Courts of Omaha, Ltd. v. Thomas M. Schuessler and Harry W. Meginnis, Jr., Douglas County District Court, docket 843, page 474, hereinafter referred to as the underlying case. In a bifurcated proceeding, the district court determined that Sports Courts could not have been successful in the underlying case and thus dismissed the within action.

## SETTING OF CONTROVERSY

Sports Courts alleges that as a result of the dismissal of the underlying case, it is time barred from successfully pursuing its right to recover on a certain promissory note. So far as is relevant, the defendant attorneys answered that inasmuch as Sports Courts had improperly disposed of certain collateral, Sports Courts would have been precluded from recovering a deficiency judgment on the note and thus had no basis for maintaining this action.

There are three elements a plaintiff alleging attorney negligence must prove: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) that such negligence resulted in and was the proximate cause of loss to

the client. *Patterson v. Swarr, May, Smith & Anderson*, 238 Neb. 911, 473 N.W.2d 94 (1991).

The district court elected to nibble at the resolution of this action by trying only whether the method of disposition of the subject collateral was such as to prevent Sports Courts from obtaining a deficiency judgment on the promissory note. As a consequence, the posture of the action is such that no question exists concerning Sports Courts' employment of the defendant attorneys in the underlying case, the defendant attorneys' negligence in permitting the dismissal of the underlying case, or the extent of Sports Courts' damages, if any. The only question is whether the negligence of the defendant attorneys resulted in and was the proximate cause of loss to Sports Courts.

## TRANSACTIONAL FACTS

Approximately 5 years after Sports Courts was organized and began operations as a limited partnership, it sold certain of its assets to Tom–Har, Inc., a corporation whose stockholders consisted of Schuessler and Meginnis, the two individuals named as defendants in the underlying case. As part of that transaction, Tom–Har executed a promissory note in favor of the limited partners of Sports Courts.

Later, as Tom–Har was then considered to be in default, Sports Courts hired Brower to review the "purchase agreement or promissory note" relating to that transaction. As a result, the arrangement between Sports Courts and Tom–Har was restructured under documents which Brower prepared and which were executed on May 15, 1984. A cash payment was made toward the note, Tom–Har reaffirmed the debt, and Schuessler and Meginnis became comakers of the note. In addition, a trust deed was executed to secure the obligation, and Schuessler and Meginnis pledged all the capital stock of Tom–Har as security, actual physical possession of which had already been obtained by Brower. At some point, Brower also acquired possession of the stock record book. The pledge agreement named Brower the monitor and agent of Sports Courts. According to the Tom–Har bylaws, in order to vote the shares, Schuessler and Meginnis had to be registered in Brower's name as pledgee, and to issue new shares, the stock

certificate had to be signed by the president and secretary.

Tom–Har also executed a security agreement in favor of Sports Courts which undertook to encumber all of the tangible and intangible assets of Tom–Har located in Omaha. The security agreement was perfected by the filing of a financing statement.

Sports Courts' secretary–treasurer, Marlo Burg, later informed Brower that two monthly payments due on the note were in default. Brower advised Burg of the options available, and at Burg's request, Brower sent a notice of default stating that Sports Courts had directed him as monitor to take all action necessary under the pledge agreement. In another notice of default, Burg advised Tom–Har, Schuessler, and Meginnis that the note would be accelerated if the default was not cured by a specified date.

During discussions over the next few days, Burg and Brower concluded that Brower, acting under the pledge agreement as monitor, would vote the stock. Pursuant to the pledge agreement, Brower sent notice to Tom–Har advising that he had exercised voting rights to the pledged shares of Tom–Har capital stock and had elected Burg as the new sole director of Tom–Har and asking that such be reflected in Tom–Har's corporate minutes. In lieu of a special shareholder meeting, Brower prepared a document in which Tom–Har consented and agreed to the action electing Burg, revoked any action of the former directors in seeking bankruptcy protection, and prevented the taking of any such future action. (The filing for bankruptcy protection was of concern to Sports Courts because Tom–Har's assets secured its note to the limited partners of Sports Courts.)

Subsequently, Tom–Har's bylaws were amended, after which five directors, Burg and four other limited partners of Sports Courts, were elected to the Tom–Har board. Together, these directors also owned 85 percent of Sports Courts.

The day–to–day operations were still left in the hands of Tom–Har. But as the directors wished to sell the business, continuing efforts to do so were made. Brower, again acting as monitor under the pledge agreement, sent a letter to attorney Mike Morrow, who he believed was representing both Schuessler and Meginnis, soliciting written offers to purchase

the Tom–Har capital stock held under the pledge agreement.

Morrow, representing Meginnis, contacted Brower with a proposal by Meginnis and others to purchase the capital stock of Tom–Har, which Sports Courts found acceptable. However, after Brower sent notice to Schuessler and Tom–Har of the intent to sell the Tom–Har capital stock to Meginnis and others, negotiations broke down, and the buyers refused to proceed.

Thereafter, a special meeting of the board of directors of Tom–Har was held, at which the directors were also made officers. Because of concerns about the condition of the club, its level of membership, and its value as collateral, Schuessler was relieved of further responsibility for the operations of the business. Brower was asked to investigate the status of the operating facility and subsequently did so. Although not reflected in the minutes, Brower testified that he was also instructed to take a series of actions to acquire actual physical control of the facility and its assets and to deny Schuessler access or control of the operations or assets.

At a meeting held a few days later, Brower reported the condition of the club to the board, confirming the board's concerns, including those about unpaid bills and taxes and the hygiene of the club. On the following day, that is, on April 9, 1985, without giving Schuessler and Meginnis any further notice, Brower wrote "cancelled" on their Tom–Har stock and reissued the stock to "Sam R. Brower, 'Monitor' under a Certain Pledge Agreement dated May 15, 1984."

## TRIAL FACTS

At the partial trial described earlier, the district court received, over Sports Courts' objection, the testimony of a law professor who opined that the cumulative effect of the postdefault acts Brower took as monitor on behalf of his client with regard to the capital stock of Tom–Har was such as to have constituted a disposition of collateral under the provisions of Neb. U.C.C. § 9–504 (Reissue 1980), and that Brower's failure to have given appropriate notice to Tom–Har, Schuessler, and Meginnis precluded the obtaining of a deficiency judgment on the note.

## ANALYSIS

Our analysis is confined to the two dispositive assignments of error asserted by Sports Courts, to wit, that the district court (1) improvidently received testimony concerning the status of the applicable law and (2) incorrectly judged that law.

*Receipt of Testimony.*

At all times during and prior to the date Brower wrote "cancelled" on the Tom–Har stock of Schuessler and Meginnis, § 9–504 read in pertinent part:

> (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .
>
> . . . .
>
> (3) . . . [R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . . .

Under that version of § 9–504, compliance with the notice requirement was a condition precedent to the secured creditor's right to recover a deficiency which the creditor had the burden of pleading and of proving. *Mason State Bank v. Sekutera*, 236 Neb. 361, 461 N.W.2d 517 (1990); *Bank of Gering v. Glover*, 192 Neb. 575, 223 N.W.2d 56 (1974).

Thus, if the actions Brower took on behalf of Sports Courts constituted a disposition of the Tom–Har stock, Sports Courts would not have been able to recover a deficiency judgment in the underlying case on the note executed in its favor by Tom–Har, Schuessler, and Meginnis. In that connection, we should note that Sports Courts contends that even if Brower's actions constituted a disposition of the stock without proper notice, neither he nor his firm may use that prior negligence on their part to insulate them from liability on their subsequent negligence in permitting the underlying case to be dismissed. Because, as becomes clear later, we need not concern ourselves with that contention, we do not do so.

There being no dispute as to the actions Brower took in

connection with the capital stock of Tom–Har, whether those actions constitute a disposition of the stock as contemplated by § 9–504 resolves itself into a matter of statutory interpretation, which is a question of law. See *Sylvis v. Walling, ante* p. 168, 532 N.W.2d 312 (1995).

We have previously pointed out that expert testimony is relevant and admissible only if it tends to help the trier of fact understand the evidence or to determine a fact issue and that expert testimony concerning the status of the law does not tend to accomplish either of these goals; as a consequence, expert testimony concerning a question of law is generally not admissible in evidence. *Schmidt v. Omaha Pub. Power Dist.*, 245 Neb. 776, 515 N.W.2d 756 (1994); *Kaiser v. Western R/C Flyers*, 239 Neb. 624, 477 N.W.2d 557 (1991); *Sasich v. City of Omaha*, 216 Neb. 864, 347 N.W.2d 93 (1984); Neb. Evid. R. 401, 402, and 702, Neb. Rev. Stat. §§ 27–401, 27–402, and 27–702 (Reissue 1989). See, also, *State v. Thomas*, 236 Neb. 553, 462 N.W.2d 862 (1990) (expert testimony generally not admissible as proof counsel was ineffective).

Thus, the district court erred in receiving the opinion of a law professor concerning the status of the law.

*Judging the Law.*

The above having been resolved, it becomes necessary to determine whether the district court correctly judged the law to be such that Brower's conduct constituted a § 9–504(1) disposition of the Tom–Har capital stock.

Neb. U.C.C. § 9–207(4) (Reissue 1980) provided:

A secured party may use or operate the collateral for the purpose of preserving the collateral or its value or pursuant to the order of a court of appropriate jurisdiction or, except in the case of consumer goods, in the manner and to the extent provided in the security agreement.

Moreover, the pledge agreement in this case reads in pertinent part as follows:

Immediately and without further notice, upon the failure of [Tom–Har, Schuessler, and Meginnis] to make any payment due to [Sports Courts] in accordance with the terms and provisions of the Note, whether or not the

Pledged Stock shall have been registered in the name of [Sports Courts] or [its] nominee, [Brower], or his nominee, as agent for [Sports Courts], shall have with respect to the Pledged Stock, the right to exercise all voting rights as to all shares and, as to all of the Pledged Stock, all other corporate rights . . . as if [Brower] were the absolute owner thereof . . . .

Sports Courts argues that, as its agent, Brower merely acted pursuant to the foregoing statute and contractual authority to preserve the collateral of the going business and that his acts thus did not amount to a § 9–504(1) disposition of the Tom–Har capital stock.

Any suggestion that we have already resolved this issue adversely to Sports Courts is misplaced. It is true that in *Allis–Chalmers Corp. v. Haumont*, 220 Neb. 509, 371 N.W.2d 97 (1985), we ruled that a secured creditor's repossession and subsequent treatment of the collateral constituted a § 9–504(1) disposition such as to require notice to the debtors. The collateral therein consisted of new and used equipment. After taking the new equipment, the secured creditor gave the debtor credit at the invoice price, including freight; the used equipment was sold at private sales. The treatment by the Allis–Chalmers creditor of the used equipment bears no relevant similarity to the treatment of the Tom–Har stock in this case. The Allis–Chalmers used equipment was transferred to a third party for value. Here, there was no third party and no exchange of value. While it is true that just as here there was no transfer to a third party of the Allis–Chalmers new equipment, in *Allis–Chalmers Corp.* there was value given, in that the debtor was credited with the full invoice price of the equipment. The Allis–Chalmers creditor in effect sold the new equipment to itself for whatever later transfers to third parties the creditor might wish to make. Here, Brower merely exercised the rights in the stock given him by the pledge agreement in order to protect the going business the stock represented.

A number of courts have held that retention of collateral does not in and of itself constitute a disposition under § 9–504(1). See, *Lamp Fair, Inc. v. Perez–Ortiz*, 888 F.2d 173 (1st Cir. 1989); *Appeal of Copeland*, 531 F.2d 1195 (3d Cir. 1976);

*General Elec. Capital Corp. v. Vashi*, 480 N.W.2d 880 (Iowa 1992); *IFG Leasing Co. v. Gordon*, 776 P.2d 607 (Utah 1989). It has also been suggested that disposition under § 9–504(1) and (2) connotes an actual transfer of an interest in the collateral by sale, lease, or contract. See, *General Elec. Capital Corp., supra*; *IFG Leasing Co., supra*.

Although holding that for other reasons the creditor could not obtain a deficiency judgment, the court in *Lamp Fair, Inc.*, 888 F.2d at 177, in applying the laws of Connecticut, observed that whatever might be the meaning of the "words 'otherwise dispose of,' they do not include permanent retention of the collateral for the secured party's own use."

Illuminating reasoning is also found in *Fletcher v. Cobuzzi*, 499 F. Supp. 694 (W.D. Pa. 1980). Therein, the debtor corporation defaulted, and the arrangement was restructured such that the corporation's president made himself personally liable on the debt and put up his stock in the corporation as collateral. After more defaults and unfulfilled new agreements, the secured creditor transferred the stock into its own name and later sold some of the stock without the president's knowledge. The value of the stock subsequently increased, and the president requested that some of the stock be sold, since the debt was now overcollateralized. Upon learning that some of the stock had already been sold, the president demanded the difference between the sale price and the higher value of the stock at the time he requested that it be sold.

The secured creditor claimed that the earlier transfer of the stock into its name had been a foreclosure. In rejecting that claim, the *Fletcher* court held that the mere transfer of the name on the stock did not constitute an "other disposition" within the meaning of § 9–504(1) because such a disposition required some assignment for value of the secured creditor's rights in the collateral. The transfer to the secured creditor was not such an assignment. Instead, the court characterized what had taken place as a repossession or perfection of the secured creditor's rights in the collateral by means of eliminating the president's title and vesting it in the secured creditor. Thus, the secured creditor was liable to the president for the value of the stock in excess of the sums due the secured creditor.

We are persuaded that under the circumstances, Brower's acts in voting the capital stock, in taking corporate action in accordance with that vote, and in canceling the registration of the stock in the names of Schuessler and Meginnis and reissuing it in his name do not constitute a § 9–504(1) disposition of the stock. We must therefore conclude that the district court erred in ruling that Sports Courts could not have been successful in the underlying case.

## CONCLUSION

Accordingly, we reverse the judgment of the district court and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

LANPHIER, J., not participating.