BEVERLY J. WOOD, APPELLANT, V.
McGRATH, NORTH, MULLIN & KRATZ, P.C., APPELLEE.
581 N.W. 2d 107

Filed June 30, 1998. No. A-96-1243.

David Geier, of Healey & Wieland Law Firm, for appellant.

John R. Douglas and Terry J. Grennan, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and IRWIN, Judges.

MILLER-LERMAN, Chief Judge.

In this legal malpractice action, Beverly J. Wood (Beverly) appeals from an order of the district court dismissing her suit against McGrath, North, Mullin & Kratz, P.C. (McGrath). The legal malpractice action related to the professional advice of one of McGrath's attorneys, Timothy J. Pugh (Pugh). At the malpractice trial, Beverly attempted to prove that Pugh had negligently represented her in a dissolution action against her former husband, Jacob Wood (Jacob), which action was concluded by a settlement and decree. On appeal, Beverly argues that the district court erred in directing a verdict in McGrath's favor and that the trial court erred in failing to allow her to present certain evidence at the malpractice trial. For the reasons set forth below, we affirm.

## BACKGROUND

*Marriage and Dissolution Action.*

Jacob and Beverly were married on August 25, 1973, and had two children, Joseph, born July 12, 1979, and David, born February 22, 1983. Jacob and Beverly were divorced by decree of dissolution dated July 1, 1991. On that date, the trial court found that a "Property Settlement & Custody Agreement" (Agreement) entered into by the parties was not unconscionable and approved such Agreement. Both Jacob and Beverly were represented by counsel at the time they signed the Agreement. Jacob was represented by Irving Epstein, and Beverly was represented by Pugh.

In the Agreement, Beverly was awarded custody of the children with reasonable visitation rights for Jacob. Jacob agreed to pay $1,600 per month in child support. In addition to child support, Jacob agreed to provide "the cost of each child's college

education, including tuition, room and board, books, and incidental fees in an amount at least equal to the charges then being assessed by the University of Nebraska-Lincoln for a Nebraska resident student." Regarding these payments, Jacob agreed to pay for two school semesters per year per child so long as each child maintained full-time status and a "C" average.

Jacob also agreed to pay Beverly alimony in the amount of $3,300 per month for a period of 72 months. Both parties agreed that "neither of them will seek a modification of the alimony award during the 72 month period after entry of Decree." Of the $3,300 designated as alimony, a portion was attributable to a payout of the property settlement.

In the Agreement, Jacob and Beverly each received (1) all personal clothing, jewelry, rings, and other personal items in his or her possession; (2) all checking accounts, savings accounts, and credit cards in his or her name; and (3) all household goods, furnishings, and personalty in his or her possession.

Jacob also received (1) a 1984 Buick automobile; (2) all certificates of deposit with First National Bank of Omaha; (3) all accounts with Alex Brown & Company; (4) his 401(k) plan with Werner Enterprises, Inc. (Werner), Jacob's employer at the time of the Agreement; (5) his IRA; (6) 26,901 shares of Werner stock; and (7) all of his vested and unvested stock options in Werner.

Beverly received the following assets: (1) the family residence; (2) cash in the amount of $28,000, to be paid by Jacob at the time of the entry of the decree; and (3) a lump sum property distribution in the amount of $180,000, payable at the rate of $2,500 per month for a period of 72 months with no interest.

The Agreement provided that Jacob would pay Beverly's attorney fees in the amount of $9,976.90 and contained other provisions which are not relevant to this appeal.

Shortly after entry of the decree, in September 1991, Jacob was promoted to president of Werner, and his salary increased as a result. Pugh then filed an application to modify the decree, seeking an increase in child support and alimony, despite the clause in the Agreement prohibiting the modification of alimony within 6 years of the entry of the decree. The record shows that the parties tentatively entered into an agreement

before a hearing was held on Beverly's application to modify and that in this agreement, Jacob agreed to pay Beverly an additional $500 a month, including $250 for education expenses of his sons and another $250 per month which Beverly could use for her own higher education goals. The record shows that while Beverly initially accepted this agreement, she subsequently declined to adhere to it because although Jacob had agreed to pay Beverly's attorney fees in connection with her application to modify, Jacob would not agree to pay other outstanding attorney fees Beverly had incurred. The record shows that Pugh withdrew as Beverly's counsel when Beverly decided that she would not accept the extra $500 per month. Beverly then obtained new counsel, Paul Galter, who assisted Beverly in releasing her from this agreement. The record shows that because of this release, Jacob continued to pay the same amount of alimony and child support set forth in the parties' July 1, 1991, Agreement.

*Legal Malpractice Action.*

On November 8, 1996, Beverly filed a third amended petition against McGrath, alleging, inter alia, that the Agreement, which Pugh advised her to accept, was unfair and disproportionate to her best interests; that Pugh allowed her to accept less than her share of the marital estate; and that Pugh permitted and advised her to accept alimony conditions contrary to her best interests. Beverly alleged that Pugh had advised her that she was receiving 40 percent of the marital estate, when in fact she received less than 30 percent of the marital estate. Beverly alleged that Pugh had failed to correctly calculate the marital estate in the Agreement because he did not include Jacob's Werner stock options vesting after the dissolution and because he reduced the value of Jacob's common stock in Werner by its potential capital gains tax. Beverly also alleged that Pugh failed to adequately inform her concerning the provision in the Agreement precluding modification of alimony.

Beverly alleged that Pugh failed to advise her that she should reject the settlement proposal as unreasonable and take her case to trial. Beverly alleged that as a result of Pugh's negligence, she suffered financial damage, and prayed for special and general damages and costs.

In its answer to Beverly's third amended petition, McGrath admitted that Pugh had represented Beverly in her divorce, but denied that McGrath had deviated from the standard of care for attorneys in Omaha, Nebraska.

The trial on Beverly's malpractice claim was held on November 12 through 14, 1996. During trial, the trial court sustained a motion in limine that McGrath had filed prior to trial requesting that evidence of the current value of Jacob's Werner stock not be allowed into evidence.

At trial, Beverly attempted to prove that Pugh had committed malpractice by allowing her to enter into a property settlement agreement that was not fair and reasonable because (1) Jacob's 26,901 shares of Werner stock were undervalued because their value was decreased by their potential capital gains tax; (2) the marital estate included only Jacob's Werner stock options which were vested at the time of the Agreement, and not Jacob's unvested Werner stock options; and (3) the Agreement contained a clause prohibiting the modification of alimony for 6 years after entry of the decree.

At the malpractice trial, Beverly testified that she married Jacob in 1973 and that neither she nor Jacob had any money or property at that time, except for an older car owned by Jacob. Beverly testified that she graduated from high school and took a few art classes at Drake University. She testified that after she married Jacob, she worked outside of the home for 6 years until the parties had their first child and that she then stayed at home to care for their child. Beverly testified that after they were married, Jacob graduated from college with a degree in accounting, passed the CPA examination, and accepted a job at Werner in 1983 or 1984. Beverly testified that Jacob was still employed at Werner at the time of the underlying divorce.

The evidence shows that at the time of the underlying divorce, Jacob owned 26,901 shares of Werner stock and certain stock options entitling Jacob to purchase Werner stock at some future point in time at a fixed price. At the time of the underlying divorce, Jacob had the right to acquire 24,500 shares which had vested before the decree and the right to acquire 32,000 more shares which were to vest after the decree. The record shows that the vested stock options were considered part of the

marital estate in the settlement negotiations but that the unvested stock options were not. The record also shows that Jacob could exercise these options only if he remained employed with Werner.

At the malpractice trial, Beverly attempted to show both that Jacob exercised all of his Werner stock options by the end of 1993 and the profit that Jacob had received from these transactions. After McGrath made an objection, which the trial court sustained, Beverly submitted an offer of proof. In another offer of proof, Beverly showed that if she had received half of Jacob's Werner stock on July 1, 1991, and held it until September 30, 1996, the stock would have been worth $641,728 and Beverly would have received dividend income in the amount of $13,748.50, subject to income taxation on this stock for that period of time.

Beverly testified that in the underlying divorce case, she was initially represented by Steven Lustgarten. Lustgarten testified at the malpractice trial that he represented Beverly from late 1989 until February 1991; that he had contact with Beverly 65 times during that period; and that he withdrew as Beverly's counsel because she could not decide whether she wanted a divorce or a legal separation and because he felt that he could not arrange a settlement with which Beverly would be satisfied. Beverly acknowledged that she told Lustgarten that she was open to and willing to take cash in lieu of stock and stock options. Beverly testified that she subsequently hired Pugh to represent her in the underlying divorce.

Beverly testified that she signed the Agreement on July 1, 1991, after reading the Agreement over twice—first, outside of Pugh's presence, and second, in Pugh's presence at his insistence. Beverly testified that Pugh told her that she was receiving approximately 40 percent of the marital estate and that she asked Pugh if this was the best they could do, to which Pugh responded that she would get anywhere from 35 to 50 percent of the marital estate if they went to trial.

Beverly testified that Pugh did not discuss the different terms of the Agreement with her, including the provision precluding the modification of alimony for 6 years, and that she did not ask Pugh any questions about the Agreement after reviewing it.

Beverly testified that she realized that she was not receiving any shares of Werner stock, but that she signed the Agreement anyway because she felt like she had no other options.

Beverly testified that she never told Pugh that she did not want to own Werner stock or that she was not interested in possessing an interest in Werner stock options. Beverly testified that Pugh told her that Jacob would not enter into an agreement which would allow her to receive a portion of either his Werner stock or his Werner stock options. Beverly stated that Pugh indicated that both the stock and the stock options would have to be valued so that Beverly would receive her rightful portion of both in the form of cash. Beverly also testified that she told Pugh that she wanted to go to school for videography and that she might want to start her own business someday. Beverly testified that she talked to her accountant 8 to 10 times while represented by Lustgarten about whether she should take a portion of the Werner stock and stock options and that she continued to talk to her accountant about this decision during the time Pugh represented her.

Beverly testified that Pugh failed to tell her (1) that the value of the Werner stock might not be reduced by its potential capital gains tax if they went to trial; (2) that under Nebraska law, she might have received an interest in Jacob's unvested stock options; and (3) that Nebraska statutes provide that alimony may be modified for good cause. Beverly testified that if Pugh had told her any of these things, she would not have signed the Agreement and would have insisted on going to trial.

Beverly testified that Pugh never mentioned that she could go to trial if the settlement agreement was not good enough, that she was unaware that a trial date for the underlying divorce had been set, and that she had not received two documents entered into evidence showing that a trial date had been set in the divorce action.

Beverly testified that at the time of the divorce, she was aware that the daughter of Werner's chairman of the board and controlling stockholder disliked Jacob and that the daughter wanted Jacob's job. Beverly testified that she told Pugh that the daughter disliked Jacob, but not that Beverly feared that Jacob might lose his job as a result.

Two expert witnesses who are attorneys, Galter and David Domina, testified on Beverly's behalf. Both Galter and Domina testified that Pugh violated applicable standards of legal practice (1) by reducing the value of Jacob's Werner stock by its potential capital gains tax, because such taxes were not imminent; (2) by failing to include the unvested stock options in the marital estate, since Jacob became entitled to the options during the parties' marriage; and (3) by including a provision prohibiting the modification of alimony in the Agreement. Both testified that Pugh was negligent if he failed to explain to Beverly the law on these various matters and the consequences of these provisions and if Pugh failed to allow Beverly to make the ultimate decision as to whether or not to go to trial.

Additionally, Galter testified that the tendency by the courts in the past 10 years in Nebraska has been to divide the marital estate in half; that Pugh should have advised Beverly of this fact; and that ultimately, Pugh should have advised Beverly to reject the settlement agreement and go to trial. Galter attempted to state what would have happened if the underlying divorce case had gone to trial, but McGrath objected, and the trial court sustained McGrath's objection. In so doing, the trial court stated that an expert is not permitted to give an opinion as to what a specific judge would do in a specific case. In an offer of proof, Galter stated that if permitted to testify he would say that if Beverly had rejected the property settlement and the case had gone to trial, a trial judge would have split the parties' marital estate in half, the value of the Werner stock would not have been reduced by the anticipated capital gains tax, and Jacob's unvested stock options would have been considered part of the marital estate because they were earned during the parties' marriage. Galter stated that a trial court would have awarded Beverly the marital home along with personal property in her possession, that the Werner stock and stock options would have been divided equally, and that the parties' remaining assets would have been used to equalize the marital estate. Lastly, Galter stated that a trial court would not have included a provision in the decree prohibiting the modification of alimony. Similarly, Domina was not allowed to state what the outcome at a trial would have been if Beverly had rejected the Agreement

and gone to trial, but Beverly did not submit an offer of proof regarding Domina's proposed testimony. Domina did testify, however, that a lawyer observing the appropriate standard of care and representing Beverly in the underlying divorce would have striven for an equal division of assets regardless of the fact that Jacob was the primary income earner.

Pugh testified that he is a member of and a shareholder in McGrath, that he was admitted to the bar in 1970, and that he has practiced law in Omaha since that time. Pugh testified that he became involved on February 28, 1991, in representing Beverly in the underlying dissolution action and that he had his first meeting with Beverly on April 8, 1991, to review financial information pertaining to Jacob and Beverly's divorce. Pugh testified that, subsequently, in a letter dated April 17, 1991, he wrote to Beverly advising her that the Werner stock should be split equally and that she should collect a portion of Jacob's unvested stock options as they vested. Pugh testified that after Beverly received this letter, he met with Beverly and her accountant and that the three of them determined that Beverly would be better off pursuing a cash settlement rather than obtaining stock or stock options, because if Beverly received stock she would probably be forced to sell it to obtain cash and would have to pay capital gains tax at the rate of 34.9 percent. Pugh testified that he thought it would be better for Beverly to take cash and for security spread out such payments over time because Beverly was short on cash. Pugh testified that in the course of settlement, Jacob insisted on keeping the Werner stock and stock options. Pugh opined that they would have had to go to trial if Beverly had insisted on receiving a portion of the Werner stock and stock options.

Pugh testified that the provision in the Agreement which stated that alimony could not be modified for 6 years after entry of the decree was placed into the Agreement at the last minute and that he discussed the provision with Beverly, including what it meant and how it would affect her. Pugh testified that he agreed to this provision on Beverly's behalf only because Beverly told him that Jacob could lose his job and that such a provision would protect Beverly in the event this occurred. Pugh testified that he discussed every provision of the

Agreement with Beverly and that anytime there was a change, he would call and speak to her about it.

At the close of Beverly's evidence, McGrath moved for a directed verdict and dismissal of Beverly's petition. The trial court sustained McGrath's motion on the issue of the valuation of Jacob's Werner stock and its reduction in value by the anticipated capital gains tax and on the issue of the exclusion in the Agreement of the unvested Werner stock options. At this point in the trial, the trial court declined to direct a verdict in McGrath's favor on the questions of whether Pugh adequately advised Beverly as to the provision in the Agreement precluding the modification of alimony and as to whether or not Beverly should have taken cash instead of stock.

McGrath then presented evidence. Epstein testified that the Werner stock was properly valued for settlement at its market value minus any potential capital gains tax. Epstein testified that he insisted upon the clause prohibiting the modification of alimony, but did not state why. Epstein stated that he took the position in the underlying divorce that Beverly would be entitled to only one-third of the marital estate because Jacob was working long hours and making the money. Epstein stated that the Agreement was favorable for Beverly in several respects: first, because Jacob agreed to provide a college education for his sons, which in Epstein's opinion would not have been ordered by the district court at trial; and second, because Jacob agreed to pay for Beverly's attorney fees, which were approximately $10,000.

Joseph Meusey, an attorney, also testified on Pugh's behalf. Meusey testified that in his experience, courts and lawyers normally value stock "net of capital gains tax." He also testified that in his opinion, Jacob was entitled to a larger share of the marital estate because Jacob generated the cash flow. Meusey testified that in his opinion, the Agreement was fair and reasonable and that in his opinion, Pugh met the standard of care in representing Beverly. Additionally, Meusey testified that Beverly received several items in the Agreement that she would not have received if the parties had gone to trial, including Jacob's promise to pay for the boys' college expenses and his agreement to pay approximately $10,000 of Beverly's attorney

fees. Meusey also stated that Beverly benefited from the provision which precluded the modification of alimony, since Beverly would still receive alimony if Jacob lost his job, and that Beverly benefited because the parties' residence, which was awarded to her, was valued at $160,000 in the settlement negotiations even though Beverly thought it was worth approximately $200,000.

At the close of the evidence, the trial court granted McGrath's motion for a directed verdict, stating that Beverly had failed to prove that she had been damaged either by taking cash instead of stock or by the provision precluding the modification of alimony. The trial judge stated that Pugh's actions did not constitute malpractice, because Beverly received approximately 40 or 45 percent of the parties' marital estate, an amount well within the realm of what Beverly would have received if she had decided to go to trial.

Beverly appeals.

## ASSIGNMENTS OF ERROR

On appeal, Beverly contends that the trial court erred in (1) refusing to receive into evidence expert testimony concerning the reasonable and probable result in the underlying divorce case had that case gone to trial, (2) granting McGrath's motion for a directed verdict, (3) refusing to receive evidence showing that Jacob had exercised all of his Werner stock options after entry of the decree and the ultimate profits Jacob received from this disposition, (4) refusing to allow her expert to testify as to the current value of the Werner stock which Beverly claims she would have received in the underlying divorce case had the case gone to trial, and (5) refusing to receive into evidence expert testimony showing the dividends Beverly would have received if she had received the above-mentioned stock in the divorce.

## STANDARD OF REVIEW

A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996).

The party against whom the verdict is directed is entitled to have every controverted fact resolved in his or her favor

and to have the benefit of every inference which can reasonably be drawn from the evidence. *McWhirt, supra.* If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Id.*

## ANALYSIS

*Necessity of Expert Testimony.*

Beverly contends that the trial court erred in granting McGrath's motion for a directed verdict and dismissing her malpractice action against McGrath. McGrath argues that the trial court properly granted its motion for a directed verdict at the close of all of the evidence.

Beverly contends that the trial court erred in granting a directed verdict because the evidence she produced at the malpractice trial proved that she did not receive a reasonable share of the marital estate due to legal malpractice. Specifically, Beverly contends that Pugh committed malpractice by causing her to enter into a settlement that was unreasonable because of (1) the manner of the valuation of Jacob's shares of Werner stock in the Agreement, (2) the manner of the valuation in the Agreement of Jacob's Werner employee stock option rights, and (3) the provision in the Agreement prohibiting the modification of alimony for 6 years after entry of the decree.

In legal malpractice cases, the plaintiff must prove the following: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) that such negligence resulted in and was the proximate cause of loss to the client. *Baker v. Fabian, Thielen & Thielen,* 254 Neb. 697, 578 N.W.2d 446 (1998); *McWhirt v. Heavey, supra; Sports Courts of Omaha v. Brower,* 248 Neb. 272, 534 N.W.2d 317 (1995). The negligence of counsel must affect the viability of the client's interest and be shown to do so. *Staman v. Yeager & Yeager,* 238 Neb. 133, 469 N.W.2d 532 (1991).

This court is aware that it has been widely held that in malpractice actions against attorneys, expert evidence is generally required to establish the attorney's breach of the standard of care. Annot. 14 A.L.R. 4th 170 (1982). In *Baker, supra,* filed after oral argument in the present case, the Nebraska Supreme

Court held, inter alia, that expert testimony regarding the status of the law is generally irrelevant and inadmissible, relying on *Sports Courts of Omaha, supra.*

Generally, in Nebraska, in professional negligence cases, the issue of whether a specific professional act or service demonstrates a lack of skill or knowledge or failure to exercise reasonable care is a matter that must be proved by expert testimony. See, e.g., *Vilcinskas v. Johnson*, 252 Neb. 292, 562 N.W.2d 57 (1997) (medical malpractice); *Overland Constructors v. Millard School Dist.*, 220 Neb. 220, 369 N.W.2d 69 (1985) (architectural malpractice). But see *McVaney v. Baird, Holm, McEachen*, 237 Neb. 451, 466 N.W.2d 499 (1991) (holding that it was not necessary for plaintiff to offer expert testimony regarding standard of care where defendant attorney had testified as to standard of care and conduct that breached standard of care).

■ The Nebraska Supreme Court has said: " 'A professional act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual . . . .' An architect performs professional services, as do lawyers, doctors, accountants, and investment advisers." *Overland Constructors*, 220 Neb. at 229, 369 N.W.2d at 75. Although the Nebraska Supreme Court has not expressly stated that an expert's testimony is required to support a professional negligence claim in a legal malpractice case on the issues of standard of care and alleged damages due to a breach thereof, because an attorney performs professional services, it follows that expert testimony is generally required to prove a deviation from the standard of care and damages occasioned thereby in legal malpractice cases except in those cases where no expert is required due to common knowledge. *Boyle v. Welsh*, 6 Neb. App. 931, 578 N.W.2d 496 (1998). As noted above, under *Baker, supra*, an expert's testimony is not required regarding the issue of the status of the law.

*Exclusion of Expert Opinion Evidence Regarding Outcome of Dissolution Trial.*

Initially, we address Beverly's argument that the trial court erred in refusing to receive into evidence her experts' testimony

concerning the reasonable and probable result in the underlying divorce case had that case gone to trial. Beverly proffered this evidence, inter alia, to establish damages she allegedly incurred by settling the dissolution action rather than going to trial.

Admission or exclusion of evidence is a matter for the discretion of the trial court, whose ruling on an evidential question will be upheld unless such ruling constitutes an abuse of discretion. *Getzschman v. Miller Chemical Co.*, 232 Neb. 885, 443 N.W.2d 260 (1989). An erroneous evidentiary ruling excluding evidence is not grounds for reversal where such ruling does not prejudice the party offering such evidence. *Koehler v. Farmers Alliance Mut. Ins. Co.*, 252 Neb. 712, 566 N.W.2d 750 (1997).

McGrath argues in its brief that the trial court did not err in prohibiting Beverly's experts from rendering opinions as to how a "particular" judge would have ruled on the issues if the underlying divorce had gone to trial. Brief for appellee at 28. Beverly notes in her brief, and the record confirms, that her experts attempted to show a likely trial outcome, not what a specific judge would do. Her experts were, in effect, offering evidence to establish how Beverly was damaged by signing the Agreement as compared to going to trial. After reviewing the record, we find that the trial court misperceived the law and erred in not allowing Beverly's experts to state how the issues would have been resolved at trial if the parties had tried the underlying divorce action. However, this erroneous ruling did not harm Beverly.

As outlined more fully below, had her experts been permitted to give their opinions as to the likely outcome at trial, Beverly's showing of alleged damages due to settling rather than proceeding to trial would have been in evidence. The exclusion of the expert opinions as to the result at trial generally did not prejudice Beverly with respect to the nonmodification of alimony issue, because even viewing the evidence most favorably to Beverly, Beverly's expert testified that even if the alimony provision in the Agreement was modifiable, modification of the alimony in so short a period after the settlement raised a "substantial issue of fact"; thus, Beverly did not show that she was damaged by the settlement provision, and McGrath was entitled

to a directed verdict on this issue. The exclusion of the expert opinions as to the result at trial did not prejudice Beverly with respect to the exclusion of the unvested stock options as a marital asset and the reduction of the value of the Werner stock by potential capital gains taxes, because even viewing the evidence most favorably to Beverly, the law regarding these two issues was not settled in Nebraska in 1991. Therefore, Pugh did not breach the standard of care regarding advice on these issues in 1991, and McGrath was entitled to a directed verdict on these issues.

At trial, Beverly's counsel asked both of her experts, Domina and Galter, to state generally what the result would have been in the underlying divorce had the parties gone to trial. McGrath objected to such testimony, and the trial judge sustained McGrath's objections, stating that it was not proper for a witness to testify as to what a "specific judge would do in a specific case." Beverly submitted an offer of proof in which Galter stated that if Beverly had rejected the property settlement and the underlying divorce had gone to trial, a trial court would have split the parties' marital estate in half, the value of the Werner stock would not have been discounted by the potential capital gains tax, and Jacob's unvested stock options would have been considered part of the marital estate and divided because the stock options were earned during the parties' marriage. Galter stated that a trial court would have awarded Beverly the marital home along with the personal property in her possession, that the Werner stock and stock options would have been divided equally, and that the parties' remaining assets would have been used to equalize the marital estate. Last, Galter stated that a trial court would not have included a provision in the decree prohibiting the modification of alimony. Beverly did not submit an offer of proof showing Domina's opinion as to the outcome of a trial.

The law states generally that an expert may testify about a reasonable and probable outcome at trial. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996). See, generally, *McLeod v. Fechtel*, 821 F.2d 1388 (9th Cir. 1987); *Reed v. Mitchell & Timbanard, P.C.*, 183 Ariz. 313, 903 P.2d 621 (Ariz. App. 1995). It has been held elsewhere that evidence concerning

what a particular judge would have done is improper. *Justice v. Carter*, 972 F.2d 951 (8th Cir. 1992); *Brust v. Newton*, 70 Wash. App. 286, 852 P.2d 1092 (1993). See, also, *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 362 N.W.2d 118 (1985).

In Nebraska, in *McWhirt, supra,* the Nebraska Supreme Court noted that a party properly established alleged damages due to settling rather than going to trial in a dissolution action, where the party offered evidence showing damages with reasonable certainty by comparing the obligations under the settlement with those obligations he would have incurred if the case had gone to trial. From *McWhirt*, we understand that evidence of a likely outcome at trial is admissible in a proper case. In the instant case, the trial court erred in excluding Beverly's proffered expert testimony regarding an outcome at trial, which testimony would have gone to the issue of damages. However, this ruling did not harm Beverly, because as to the alimony issue, Beverly through her received expert testimony failed to establish damages even if the Agreement had contained a modifiable alimony provision, and as to the issues of the unvested stock options and the valuation of the Werner stock, we conclude that as a matter of law Beverly's attorney did not breach the standard of care and therefore, that the exclusion of evidence regarding alleged damages resulting from Pugh's advice became unnecessary. In sum, the trial court's erroneous exclusion of expert testimony regarding an outcome at trial did not harm Beverly, as detailed more fully below, and Beverly's assignment of error in this regard is unavailing in this appeal.

*Clause Prohibiting Modification of Alimony.*

Beverly argues that Pugh neglected his duty to her by failing to explain the provision in the Agreement which stated that neither party would "seek a modification of the alimony award during the 72 month period after entry of Decree." Beverly contends that Pugh failed to tell her that the law in Nebraska is that alimony can be modified for good cause and that if she had been aware of this, she would not have entered into the Agreement and would have gone to trial instead. McGrath does not specifically address this issue in its brief. The trial court found that Pugh was not negligent in accepting the nonmodification provi-

sion on Beverly's behalf and directed a verdict on this issue in McGrath's favor. We find that even if Pugh failed to explain to Beverly the law and the consequences of the provision in the Agreement prohibiting the modification of alimony, that even if the Agreement had provided for alimony which was not restricted by a nonmodification provision, and that even if the excluded expert testimony regarding a trial outcome generally had been received, Beverly through her received expert testimony failed to prove damages with reasonable certainty resulting from the inclusion of the nonmodification provision in the Agreement. Therefore, the trial court's ruling directing a verdict against Beverly, with regard to the adequacy of Pugh's advice regarding the nonmodification of alimony, was not error.

 Generally, an order for alimony may be revoked or modified for good cause shown, unless amounts have accrued prior to the date of service of process on a petition to modify. Neb. Rev. Stat. § 42-365 (Reissue 1993). Good cause is demonstrated by a material change in circumstances which was not within the contemplation of the parties at the time of the decree or did not result from the mere passage of time. *Desjardins v. Desjardins*, 239 Neb. 878, 479 N.W.2d 451 (1992).

In support of her argument, Beverly refers to the comments of her expert, in which Beverly's expert stated in an offer of proof that if the underlying divorce action had gone to trial, the trial court would not have included a provision in the Agreement prohibiting the modification of alimony. Beverly contends that if such a provision had not been included in the Agreement and she had filed an application to modify after Jacob received a promotion shortly after their divorce, she would have been successful in receiving an increase in Jacob's alimony obligation. However, the actual testimony of Beverly's expert at the malpractice trial does not support Beverly's contention.

When Domina, Beverly's only expert who testified on this subject, was asked about whether Jacob's increase in income would constitute a material change that would lead to an increase in alimony, he stated that "that kind of change in that short a period of time would raise a substantial issue of fact that could be brought back to court in good faith for a decision by the court." It is important to note that Domina was unable to state

that a trial court would increase Beverly's alimony even if the decree did not preclude the modification of alimony. Domina stated that the material change in circumstance standard "is an amorphous standard that has to be judged case by case." Domina stated that he was unaware of any cases in which the Nebraska appellate courts have stated that an increase in a spouse's salary was necessarily a material change in circumstances justifying an increase in alimony. Domina stated that a court could go either way in deciding whether or not the increase in Jacob's income was a material change in circumstances.

Beverly's expert testified on the modification of alimony issue and, in effect, testified that even if the alimony were modifiable, its modification was in doubt. Based on the expert testimony admitted on her behalf, Beverly failed to prove with reasonable certainty that she was damaged by the inclusion of the nonmodification of alimony provision in the Agreement. We conclude that regardless of whether Pugh's recommendation to include the nonmodification of alimony provision met the standard of care, the trial court did not err in directing a verdict regarding the provision in the Agreement which prohibited either party from seeking to modify the alimony award within 6 years of the entry of the decree, because according to Beverly's expert, even if the alimony provision in the Agreement was modifiable, a modification of alimony in so short a time after the decree raised a substantial issue of fact, and that Beverly, therefore, was not damaged by the inclusion of the nonmodification provision.

*Unvested Stock Options.*

Beverly argues that Pugh committed malpractice by failing to advise her that if the underlying divorce had gone to trial, Jacob's unvested stock options would have been included in valuing the marital estate.

Regarding the unvested stock options, Beverly argues that Pugh neglected his duty by failing to inform her of the fact that many states had addressed the issue of unvested stock options prior to 1991 and the fact that many states had concluded that such options are to be included when valuing a marital estate. Beverly also relies on Neb. Rev. Stat. § 42-366(8)

(Reissue 1993), which provides in part, "The court shall include as part of the marital estate, for purposes of the division of property at the time of dissolution, any pension plans, retirement plans, annuities, and other deferred compensation benefits owned by either party, whether vested or not vested." Beverly argues that unvested stock options are "deferred compensation" as defined under the statute and thus, that Jacob's unvested Werner stock options should have been included in the marital estate.

To support her position that unvested stock option rights are part of the marital estate, Beverly cites four cases from other jurisdictions but concedes that although "[n]o Nebraska court decision spells out a method to divide such rights . . . their similarity to pension plans lends them to division in the same way as those plans are divided." Brief for appellant at 25.

McGrath notes that at the time of preparation of its brief, Nebraska had not specifically addressed the question of the inclusion of unvested stock options in a marital estate and that the law as it existed in 1991, when the parties entered into the Agreement, was that money or other property dependent upon a future event was not included within the marital estate. We conclude that the law on the inclusion of unvested stock options in valuing a marital estate was generally unsettled in Nebraska at the time Jacob and Beverly entered into the Agreement in 1991. Because of this fact, as a matter of law, Pugh did not breach the standard of care or commit legal malpractice by failing to advise Beverly that if she had gone to trial, the trial judge would have included Jacob's unvested stock options in the marital estate. Accordingly, even if Beverly's excluded expert testimony regarding a trial outcome had been received, the directed verdict in McGrath's favor on this issue at the legal malpractice trial was not error. Since oral argument of this case, the Nebraska Supreme Court has made clear that the status of the law is to be determined by the court as a matter of law without expert testimony. *Baker v. Fabian, Thielen & Thielen*, 254 Neb. 697, 578 N.W.2d 446 (1998), relying on *Sports Courts of Omaha v. Brower*, 248 Neb. 272, 534 N.W.2d 317 (1995).

Our research shows that in 1991, the law concerning unvested pension rights was generally as follows:

Pension rights that have neither vested nor matured have been held not subject to equitable distribution. . . .

It has been held that on the dissolution of a marriage, the wife is entitled to share in the husband's nonvested pension rights to the extent such rights are attributable to his work during the period when the parties were married and living together; and in at least one jurisdiction [Nebraska] it is provided by statute that the court must include as part of the marital estate, for purposes of equitable distribution, any pension plans, retirement plans, annuities, and other deferred compensation benefits owned by either party, whether vested or not vested.

24 Am. Jur. 2d *Divorce and Separation* § 906 at 890-91 (1983).

As of 1991, the Nebraska Supreme Court had not held that unvested stock options constituted "deferred compensation" under § 42-366(8), nor had it held that unvested stock option rights were a marital asset without reliance on this statute. We are aware that in a case filed May 22, 1998, following oral argument of this case, the Nebraska Supreme Court held that "unvested employee stock options and stock retention shares constitute marital property when accumulated and acquired during the marriage through the joint efforts of the parties." *Davidson v. Davidson*, 254 Neb. 656, 662, 578 N.W.2d 848, 855 (1998). Our review of the literature, not repeated here, shows that other jurisdictions in 1991 were, and remain, split regarding whether or not unvested stock options are necessarily marital assets.

At best, the law in Nebraska concerning the inclusion of unvested stock options in valuing marital estates was unsettled at the time Jacob and Beverly entered into the Agreement. For this reason, we find that Pugh was not negligent in failing to advise Beverly that if the underlying divorce action had gone to trial, the trial court would have included Jacob's unvested stock options in the marital estate and awarded Beverly a portion of these options. It has been stated, "Good faith tactical decisions or decisions made on a fairly debatable point of law are generally not actionable under the rule of judgmental immunity." *Crosby v. Jones*, 705 So. 2d 1356, 1358 (Fla. 1998) (cases collected). See, also, *Baker, supra*; *Martinson Mfg. Co., Inc. v.*

*Seery*, 351 N.W.2d 772 (Iowa 1984) (holding that attorney is not liable for error in judgment on points of new occurrence or of doubtful construction, or for mistaken opinion on point of law which has not been settled by court of last resort and as to which reasonable doubt may be entertained by informed lawyers); *Palmer v. Samuelsen*, 124 Idaho 120, 856 P.2d 1287 (Idaho App. 1993) (holding that where there is no decision by Idaho Supreme Court, attorney cannot be held liable in malpractice suit for not informing client of untried theory of recovery); *Halvorsen v. Ferguson*, 46 Wash. App. 708, 735 P.2d 675 (1986) (holding that apportionment theory which attorney allegedly failed to sufficiently emphasize while representing client involved uncertain and unsettled legal propositions and, being judgmental and tactical decision of attorney in conduct of litigation, was insufficient on which to base legal malpractice claim).

Neither the statements by experts that they would have conducted litigation in an uncertain and unsettled legal area differently nor the fact that a lawyer's emphasis or choice of theory in an unsettled area is proved erroneous by subsequent court rulings constitutes, as a matter of law, the basis for a legal malpractice action. *Halvorsen, supra.* It has also been stated:

> "Under the venerable error-in-judgment rule, if an attorney acting in good faith exercises an honest and informed discretion in providing professional advice, the failure to anticipate correctly the resolution of an unsettled legal principle does not constitute culpable conduct. . . . In short, the exercise of sound professional judgment rests upon considerations of legal perception and not prescience."

*Davis v. Damrell*, 119 Cal. App. 3d 883, 889, 174 Cal. Rptr. 257, 260-61 (1981). Furthermore, Pugh, upon exercise of informed judgment, was not obligated to give additional advice regarding the unsettled nature of relevant legal principles. See *Crosby, supra.*

Therefore, based on the status of the law in 1991, the trial court did not err in directing a verdict in McGrath's favor on the issue of Pugh's advice regarding Jacob's unvested stock options and their inclusion in or exclusion from the marital estate. This

result is not changed by the trial court's incorrect ruling excluding the expert testimony regarding an outcome at trial. Even if the trial court had allowed Beverly's experts to opine on the result of this issue if the parties had gone to trial in the underlying divorce, the jurisprudence on this issue was such that, as a matter of law, Pugh did not commit legal malpractice in connection with his advice regarding the treatment of the unvested stock options, and this issue is one for the court to decide without reliance on an expert's opinion regarding the state of the law. See *Baker v. Fabian, Thielen & Thielen*, 254 Neb. 697, 578 N.W.2d 446 (1998).

Given our finding, we do not discuss Beverly's assignment of error claiming that the trial court erred in refusing to receive evidence showing that Jacob later exercised all of his stock options after entry of the decree and the ultimate profits Jacob received from this disposition. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (holding that appellate court is not obligated to engage in analysis not needed to adjudicate controversy).

*Reduction of Value of Werner Stock by Potential Capital Gains Tax.*

Beverly argues that Pugh committed malpractice by failing to advise her that if the underlying divorce had gone to trial, the trial court would not have reduced the value of Jacob's Werner stock by its hypothetical capital gains tax. Beverly argues that a significant body of law existed outside Nebraska before 1991 which held that common stock should be valued for purposes of a marital estate without taking into consideration capital gains tax that may have to be paid in the future. Beverly contends that if Pugh had advised her that this non-Nebraska law existed and that the value of Jacob's Werner stock may not have been decreased by its potential capital gains tax if the parties had gone to trial in the underlying divorce, she would have rejected the settlement offer which reduced by the amount of potential capital gains taxes the value of the stock to be given to Jacob and would have gone to trial. Beverly, therefore, claims that Pugh breached the standard of care and committed legal malpractice in failing to correctly advise her of the foregoing jurisprudence.

McGrath responds that the law on this issue was unsettled in Nebraska in 1991 and that

> [a]n attorney who acts in good faith and in an honest belief that his advice and acts are well founded and in the best interest of his client is not answerable for mere error of judgment or for a mistake in a point of law which has not been settled by the court . . . and on which reasonable doubt may be entertained by well informed lawyers.

Brief for appellee at 13. We agree with McGrath.

This court has previously stated, " 'Counsel "is expected . . . to possess knowledge of those plain and elementary principles of law which are commonly known by well informed attorneys, and to discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques." ' " *State v. McGurk*, 3 Neb. App. 778, 789, 532 N.W.2d 354, 363 (1995), quoting *People v. McCary*, 166 Cal. App. 3d 1, 212 Cal. Rptr. 114 (1985). Our research shows that at the time Jacob and Beverly entered into the Agreement in July 1991, the Nebraska Supreme Court had not directly ruled on the propriety of reduction of stock value by the capital gains tax consequences upon distribution in a dissolution action. Compare *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988) (treating valuation of IRA for distribution purposes). This court is aware that the majority rule outside Nebraska was that although the tax consequences of any equitable distribution are a factor to be considered by the court, since disregarding the effect of taxes may result in an unrealistic and unjust result, "it has frequently been said that a court is not required to consider theoretical tax consequences of transactions that are not necessary or probable but merely conjectural." 24 Am. Jur. 2d *Divorce and Separation* § 926 at 911 (1983).

Specifically, the majority rule outside Nebraska in 1991 in marital dissolution cases was that in the absence of an anticipated sale, the value of the stock should not be reduced by capital gains tax. See, e.g., *Ford v. Ford*, 105 Nev. 672, 782 P.2d 1304 (1989); *Hovis v. Hovis*, 518 Pa. 137, 541 A.2d 1378 (1988); *Mattox v. Mattox*, 105 N.M. 479, 734 P.2d 259 (N.M. App. 1987); and *Burkhart v. Burkhart*, 169 Ind. App. 588, 349

N.E.2d 707 (1976). However, as of 1991, Nebraska had not specifically addressed this issue.

As noted above in our treatment of the unvested stock option issue, relying on *Crosby v. Jones*, 705 So. 2d 1356 (Fla. 1998); *Halvorsen v. Ferguson*, 46 Wash. App. 708, 735 P.2d 675 (1986); *Davis v. Damrell*, 119 Cal. App. 3d 883, 174 Cal. Rptr. 257 (1981); the Nebraska case *Baker v. Fabian, Thielen & Thielen*, 254 Neb. 697, 578 N.W.2d 446 (1998); and other similar cases, an attorney does not breach the standard of care when he or she gives advice in an unsettled area of the law or emphasizes one theory over another in an unsettled area, even if subsequent court rulings prove that the attorney's judgment was erroneous. Thus, in the instant case, notwithstanding the majority rule outside of Nebraska under which the value of stock distributed in a dissolution action was not discounted by capital gains taxes in the absence of imminent sale, where the Nebraska Supreme Court had not adopted that theory, Pugh's advice to accept a negotiated settlement discounting the value of the stock awarded to Jacob by capital gains taxes did not breach the standard of care.

Therefore, the trial court did not err in directing a verdict in McGrath's favor on the issue of the valuation of the Werner stock awarded to Jacob. This result is not changed by the trial court's erroneous ruling excluding the expert testimony regarding an outcome at trial. Even if the trial court allowed Beverly's experts to opine on the result of this issue if the parties had gone to trial in the underlying divorce, the status of the law is a matter for the court to decide without reliance on experts, *Baker, supra*, and the jurisprudence on this issue is such that given the state of Nebraska law in 1991, Pugh did not commit legal malpractice in connection with his advice regarding the treatment of the Werner stock.

## CONCLUSION

We conclude that the trial court erred in excluding the testimony of Beverly's experts regarding an outcome at a trial compared to the settlement agreement, but that the ruling did not harm Beverly.

We conclude that the district court properly entered a directed verdict in McGrath's favor on the issue of the non-modification of alimony, the issue of the treatment of Jacob's unvested stock options, and the issue of the valuation of the Werner stock. Accordingly, we affirm.

AFFIRMED.