**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 03-2162**

———————

DONALD A. BURNS,

Plaintiff - Appellee,

versus

WALTER C. ANDERSON; GOLD & APPEL TRANSFER,
S.A.; REVISION LLC; ENTREE INTERNATIONAL
LIMITED,

Defendants - Appellants.

———————

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  James C. Cacheris, Senior
District Judge.  (CA-02-1326-A)

———————

Argued:  September 29, 2004          Decided:  December 15, 2004

———————

Before WIDENER, TRAXLER, and GREGORY, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Michael Joshua Lichtenstein, SWIDLER, BERLIN, SHEREFF,
FRIEDMAN, L.L.P., Washington, D.C., for Appellants.  Michael E.
Wiles, DEBEVOISE & PLIMPTON, L.L.P., New York, New York, for
Appellee.  **ON BRIEF:** Steven J. Tave, SWIDLER, BERLIN, SHEREFF,
FRIEDMAN, L.L.P., Washington, D.C., for Appellants.  Sean Mack,
DEBEVOISE & PLIMPTON, L.L.P., New York, New York, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

This case involves a dispute arising out of the default by Appellants Walter C. Anderson, Gold & Appel Transfer, S.A., and Revision LLC (collectively referred to as "the Borrowers") on a $14,310,400 loan by Appellee Donald A. Burns. The district court awarded Burns $11,633,874.87, as money due under the parties' loan agreement. The Borrowers appeal the district court's award on three grounds. First, the Borrowers maintain that the district court erred in concluding Burns disposed of the collateral for the loan in accordance with the New York Uniform Commercial Code. Second, the Borrowers challenge the district court's admission of the testimony of Burns's expert witness. Third, the Borrowers argue that the district court should not have adopted the report and testimony of Burns's expert witness as a guide in calculating Burns's damages. Finding no error, we affirm.

I.

Burns lent the Borrowers $14,310,400, which was to be repaid to Burns plus interest on or before December 31, 2001. The parties memorialized this loan agreement in the Amended and Restated Promissory Note dated March 1, 2001, and Amendment No. 1 to the Amended and Restated Promissory Note dated November 1, 2001 (together referred to as "the Note").

As collateral for the Note, Anderson, Gold & Appel, Revision, and one other entity, not a party to this suit (collectively referred to as "the Pledgors"), signed an Amended and Restated Pledge Agreement, and pledged certain shares of Covista Communications, Inc. stock, a thinly traded stock registered on the NASDAQ. With respect to the Covista stock, the Pledge Agreement provided that, in the event of the Borrowers' default on the Note, Burns may sell the Collateral at a "private sale . . . upon such terms and conditions as it may deem advisable." J.A. 1849. Further, Burns "may be a purchaser of the Collateral . . . at any sale . . . and may apply against the purchase price the indebtedness secured hereby." J.A. 1852.

Under the Pledge Agreement, moreover, the

> Pledgors . . . acknowledge that the [Covista stock]. . . is . . . of a type customarily sold on a recognized market, in each case within the meaning of [New York Uniform Commercial Code § 9-610] . . . .
>
> . . . .
>
> Pledgor[s] further recognize[] that the market for the Pledged Stock is illiquid and that a public sale of the Pledged Stock in a significant quantity could have an adverse effect on the market price for the Pledged Stock. Therefore, Pledgor[s] acknowledge[] and agree[] that . . . . no private sale of the Pledged Stock (whether such sale is to the Pledgee or to a third party) will be deemed to have been made in a commercially unreasonable manner for the reason that it was made at a price that reflects a discount from the then current market price of such Pledged Stock. Pledgor[s] further acknowledge[] and agree[] that, to the fullest extent permitted by applicable law, any such discount that is calculated in accordance with an appraisal of the Pledged Stock by an

4

<u>independent appraiser</u> . . . <u>shall be deemed to be commercially reasonable</u>.

J.A. 1850, 1852-53 (emphasis added).

Burns later agreed to extend the Note's maturity date from December 31, 2001 to February 11, 2002. When the Borrowers failed to repay Burns by February 11, 2002, however, Burns served the Borrowers with a "Notice of Default." J.A. 82. Burns also mailed the Pledgors a "Notification of Disposition of Collateral" on April 3, 2002. J.A. 1872. The notification stated:

<u>Please be advised that:</u>

(1) <u>The Pledgee will effect a private sale</u> of all or a portion of the [Covista stock] sometime after April 15, 2002.

(2) You are entitled to an accounting of the unpaid indebtedness secured by the shares that the Pledgee intends to sell for a fee of $2,500. You may request an accounting by calling Gary E. Murphy . . . .

J.A. 1873 (emphasis added).

Burns then contacted John Rachlin, Senior Vice-President of Merrill Lynch, to seek advice on "how to handle the transfer of the pledged Covista [stock]." J.A. 554. Based upon the advice and information he received, Burns retained Valuation Services, Inc., an independent appraiser, to issue a report regarding the value of the Covista stock. Russell Bregman, an employee of Valuation Services, prepared a report on April 15, 2002, and valued the shares of Covista stock subject to the Pledge Agreement at $7,924,332.

Shortly after the mailing of the Notice of Disposition, however, Anderson sent Burns an e-mail message, advising Burns that "[y]ou will not get a good price per share by selling the shares now. [Covista] has just merged . . . and the results of that merger along with the other activities of the [Covista] management will on[l]y become apparent in the next few quarters." J.A. 1544-45. Based on this advice, Burns delayed selling the Covista stock in April.

At Burns's request, Bregman updated the April 15, 2002 report on August 12, 2002, and valued the Covista stock at $5,635,403. That same day, Burns, with the assistance of John Rachlin, submitted to American Stock Transfer the original stock certificates and powers of the pledged Covista stock. A transfer agent issued the replacement Covista stock certificates in Burns's name, and based on the August 12, 2002 report produced by Valuation Services, $5,635,403 was deducted from the amount the Borrowers owed under the Note. Burns memorialized this transaction by filing a Schedule 13D with the Securities and Exchange Commission, stating in pertinent part:

> On September 6, 2002, pursuant to an exercise of remedies under [the Pledge Agreement], . . . [Burns] took title to [the pledged Covista stock]. . . . As consideration therefor, the Borrowers received a credit toward repayment of their outstanding obligations under the Current Note . . . in the approximate amount of $5,635,403.

J.A. 566.

6

Because the Covista stock satisfied only a portion of the amount due under the Note, Burns commenced suit against the Borrowers seeking monetary damages in the amount remaining due under the Note.  Burns filed a motion for summary judgment, maintaining that there was no dispute as to the amount of the loan; that the Borrowers were in default on the loan; that Burns properly took ownership of the Covista stock; and that the valuation of the Covista stock was commercially reasonable as a matter of law.  The district court granted partial summary judgment in favor of Burns, finding that Burns had properly "exercised his rights to the collateral in accord with [New York Uniform Commercial Code] section 9-610."  Mem. Op. of Mar. 31, 2003, J.A. 708.  As to whether the sale price of the collateral was commercially reasonable, the district court found disputed issues of material fact remained for trial.

At trial, Burns produced the Valuation Services report and offered the testimony of Russell Bregman, the author of the report, to demonstrate the commercial reasonableness of the sale price. The district judge qualified Bregman as an expert and admitted his testimony regarding the value of the Covista stock under Rule 702 of the Federal Rules of Evidence.  The Borrowers failed to proffer any theory of their own as to the stock value, but instead relied solely on attacking the Valuation Services report and Bregman's testimony.  The district court found Bregman's testimony of

7

sufficient weight to guide the court in its determination of damages and adopted, as commercially reasonable, the Valuation Services report, calculating the worth of the Covista stock at $5,635,403. The district court deducted this amount from the amount due under the Note and entered judgment against the Borrowers, jointly and severally, in an amount of $11,633,874.87, plus fees, costs, and interest.

## II.

The Borrowers first argue that Burns failed to dispose of the Covista stock in accordance with section 9-610 of the New York Uniform Commercial Code ("NY UCC"). Whether Burns's conduct complied with section 9-610 is a question of statutory interpretation. We review a district court's statutory interpretation de novo. See WLR Foods, Inc. v. Tyson Foods, Inc., 65 F.3d 1172, 1178 (4th Cir. 1995).

In the event of a debtor's default, section 9-610 of the NY UCC permits a secured party to sell collateral and apply the proceeds of the sale towards the outstanding debt. N.Y. U.C.C. § 9-610. A secured party may purchase the collateral himself "at a private disposition . . . if the collateral is of a kind that is customarily sold on a recognized market." Id. § 9-610(c)(2) (emphasis added).

8

The Borrowers claim that Burns's actions are insufficient to amount to a purchase of collateral at a "private disposition" under section 9-610. The Borrowers contend that to purchase stock at a private disposition under section 9-610, the disposition must demonstrate some "traditional indicia of a sale," including solicitation, negotiation, and the presence of a buyer and seller whose interests with respect to the price are at odds. Reply Brief of Appellants at 7.

Neither section 9-610 nor any other provision of the NY UCC points to the limited view of the phrase "private disposition" suggested by the Borrowers.* The plain language of section 9-610(b) instructs that so long as "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, . . . [is] commercially reasonable. . . . a secured party may dispose of collateral by . . . private proceedings . . . <u>at any time and place and on any terms</u>." <u>Id.</u> § 9-610(b) (emphasis added). Section 9-610, therefore, requires that the time, place, and terms of any disposition of collateral be commercially reasonable. Except for the requirement of commercial

---

* The Borrowers refer to section 2-706 comment 4, which states that a "'private' sale <u>may be</u> effected by solicitation and negotiation conducted either directly or through a broker." N.Y. U.C.C. § 2-706 cmt. 4 (emphasis added). This comment regarding an Article 2 provision by its own terms provides only one possible method by which a party may conduct a "private sale." It does not purport to establish the exclusive means for conducting a private sale.

reasonableness, however, the time, place, and terms of a disposition of collateral under section 9-610 remain unconstrained by the NY UCC. Indeed, section 9-601(a) recognizes that the rights of a secured party after default are those "rights provided in this part and . . . those provided by agreement of the parties." Id. § 9-601(a).

In this case, Burns took absolute title to the Covista stock for an independently appraised value and applied that value to reduce the debt under the Note. These actions followed precisely the sale method with respect to the Covista stock afforded to Burns and agreed to by the parties under the Pledge Agreement. Accord N.Y. U.C.C. § 2-106 (defining "sale" as the "passing of title from the seller to the buyer for a price"). We agree with the district court, moreover, that the time, place, and terms of Burns's purchase of the Covista stock was commercially reasonable. Mem. Op. of Aug. 1, 2003, J.A. 1997-2011. Cf. Cole v. Manufacturers Trust Co., 299 N.Y.S. 418, 420-29 (Sup. Ct. 1937) (finding no "private sale" where pledgee made entries on books showing transfer of collateral and credit upon the pledgor's notes because, in part, pledge agreement did not expressly authorize the pledgee to retain the collateral at a fair value or at an appraised value and apply the proceeds on the loan). Because Burns adhered exactly to the stock sale method provided under the Pledge Agreement and the time, place and terms of the disposition was commercially reasonable, we

10

find that Burns purchased the Covista stock by private disposition as contemplated under section 9-610 of the NY UCC.

The decisions cited by the Borrowers to demonstrate that Burns's actions fail to constitute a disposition under section 9-610 are not persuasive. None of these cases are akin to the material facts present here. In <u>Sports Courts of Omaha, Ltd. v. Brower</u>, 534 N.W.2d 317 (Neb. 1995), the secured creditor, unlike Burns, failed to transfer title to himself for valuable consideration. Nor did the pledge agreement in <u>Sports Court</u>, as did the Pledge Agreement here, expressly provide for disposition by private sale in the manner utilized by the secured creditor. Unlike this case, moreover, the parties in <u>In re Copeland</u>, 531 F.2d 1195 (3d Cir. 1976), made no agreement as to the method by which the secured creditor could dispose of the collateral after default. Finally, <u>Lamp Fair, Inc. v. Perez-Ortiz</u>, 888 F.2d 173 (1st Cir. 1989), is inapposite, because the court simply held that a secured party's repossession of a store does not involve collateral of the kind customarily sold on the recognized market and, therefore, cannot fall under section 9-610. The Covista stock, in contrast, is a type of collateral customarily sold on the recognized market.

The district court's conclusion, furthermore, does not eviscerate any distinction in the NY UCC between a secured party's retention of collateral under section 9-620 and a secured party's disposition of collateral under section 9-610. To proceed under

11

section 9-620, a secured creditor must obtain a debtor's consent to acceptance of the collateral in satisfaction of all or a portion of the debt, usually by sending a proposal to the debtor setting forth the terms under which the secured party is willing to accept the collateral and obtaining the debtor's consent to the proposal in writing after default. N.Y. U.C.C. § 9-620(a)(1), (b), (c) & off. cmts. 3-5. There is no evidence to suggest that Burns retained the Covista stock under section 9-620. See Chrysler Credit Corp. v. Mitchell, 464 N.Y.S.2d 96, 97 (Sup. Ct. App. Div. 1983) (finding in the absence of written notice to the debtor that the court may not imply the creditor elected to take the collateral in satisfaction of the debt under section 9-620).

In addition, the proposal and consent prerequisites to retaining collateral in satisfaction of all or a portion of the debt under section 9-620 protect a debtor from any commercially unreasonable determination of the value of the collateral and corresponding prejudicial reduction of the debt, whereas section 9-610 affords a debtor the protection of the commercial reasonableness standard. Because the disposition of the Covista stock was commercially reasonable, the Borrowers cannot establish that they were prejudiced in any way by Burns's election to dispose of the Covista stock under section 9-610 rather than to retain it under section 9-620.

12

Accordingly, we find that Burns purchased the Covista stock at a private disposition in accordance with section 9-610 of the New York Uniform Commercial Code.

III.

The Borrowers next claim the district court should not have admitted the testimony of Burns's expert, Russell Bregman, regarding the value of the Covista stock pursuant to Federal Rule of Evidence 702. This court gives "'great deference' to a district court's decision to admit or exclude expert testimony," TFWS v. Schaefer, 325 F.3d 234, 240 (4th Cir. 2003), reviewing the decision only for abuse of discretion. See General Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997). Expert testimony is admissible if it is reliable and "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To determine whether expert testimony is reliable, "a court evaluates the methodology . . . that the proffered . . . technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself." TFWS, 325 F.3d at 240.

The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), set forth the following nonexclusive checklist for assessing the reliability of expert testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has withstood peer review and publication; (3) whether

13

there is a known or potential rate of error; (4) whether standards exist for the application of the theory; and (5) whether the theory has been generally accepted by the relevant scientific community. See id. at 593-94; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999) (extending Daubert to technical experts).

After careful consideration, the district court admitted Bregman's expert testimony, pointing out that:

> (1) Bregman has obtained specialized training, education and experience in the technical field of valuation; (2) the valuation methods used by Bregman have been tested and can be re-created; (3) the methods used by Bregman have been peer-reviewed and some of the material subject to publication; (4) the potential rate of error in conducting a valuation may be large, and differences in valuation opinions may be great, however . . . this is a weight issue . . .; (5) NACVA is a body that maintains standards used in the stock valuation process and those standards were employed in this case; and (6) the techniques used in [Bregman's] valuation have been accepted by the relevant technical community.

Mem. Op. of Aug. 1, 2003, J.A. 2001-02 (citations omitted).

On appeal, the Borrowers fail to show that the district court abused its discretion in admitting Bregman's expert testimony. The Borrowers, in fact, "do[] not mount a true Daubert challenge, for [they] do[] not argue that the[] methods [employed by Bregman] have not been tested, have not withstood peer-review and publication, have excessive rates of error, have no standards for their application, or have not been accepted in their field." TFWS, 325 F.3d at 240. Instead, the Borrowers claim that Bregman failed to review certain documents which would purportedly influence the

14

valuation of Covista stock.  The Borrowers also contend that Bregman's "actual sales" valuation was based on unreliable data. Neither of these claims, however, demonstrate that the valuation methods employed by Bregman are unreliable.  Rather, the Borrowers' claims address the proper weight to afford Bregman's testimony, not its admissibility.

The Borrowers' challenge to Bregman's qualifications is similarly without merit.  The Borrowers fail to show that Bregman's alleged lack of special expertise in valuing publicly traded, telecommunications companies prevented him from reliably valuing the Covista stock.  Burns presented ample evidence demonstrating that Bregman had specialized experience, education, and training in the field of valuation analysis and, in particular, in performing valuations of stock similar to the valuation he performed with respect to the Covista stock.  Mem. Op. of Aug. 1, 2003, J.A. 2000 (citations omitted).  Accordingly, we find no abuse of discretion in admitting Bregman's expert testimony regarding the value of the Covista stock.

IV.

The Borrowers next argue that the district court should not have relied on Bregman's "actual sales" valuation to determine Burns's damages.  In particular, the Borrowers contend that, although Bregman conceded a willing buyer or seller is assumed in

15

an "actual sales" valuation, uncontradicted testimony establishes that at least one of the sales relied upon by Bregman was not between a willing buyer and seller. In addition, the Borrowers assert that one of the three sales was never consummated and, therefore, was not properly relied upon in an "actual sales" valuation.

Whether the district court properly relied on Bregman's valuation in calculating Burns's damages is a question of fact reviewed for clear error. Estate of Godley v. Commissioner, 286 F.3d 210, 214 (4th Cir. 2002). "In applying the clearly erroneous standard . . ., [t]he authority of an appellate court . . . is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence." Jones v. Pitt County Bd. of Ed., 528 F.2d 414, 418 (4th Cir. 1975) (internal quotation marks omitted). The court "will not disturb [a district court's] findings merely because it may doubt their correctness. . . . [T]he Court of Appeals [must] be satisfied that the [d]istrict [j]udge is clearly in error before it will set his findings aside." Id. (internal quotation marks omitted). Stated another way, "a finding may be rejected as clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (internal quotation marks omitted).

16

The Borrowers' arguments do not leave us "with the definite and firm conviction that a mistake has been committed." Id. (internal quotation marks omitted). Contrary to the Borrowers' contention, the evidence does not demonstrate that one of the three sales relied upon in Bregman's actual sales valuation was between an unwilling buyer or seller. At trial, Anderson testified that Revision sold its stock because "Gold & Appel was in a very severe cash squeeze because of the market decline, and we needed cash. We needed desperately to get some cash to pay our obligations." J.A. 1054. However, Anderson's testimony does not establish that Revision was an "unwilling seller" in the context of stock valuation. Anderson was not qualified as an expert in the field stock valuation, nor did his testimony show that Revision was an unwilling seller in that context. Notably, the Borrowers cross-examined Bregman on this point, and Bregman indicated that a seller is "willing" if the transaction is "arms-length." J.A. 982-83. There is no evidence in the record to suggest that Revision failed to sell its Covista stock in an arms-length transaction.

We likewise reject the Borrowers' argument that the district court erred in relying upon a sale that was never actually consummated. As noted by the district court, Bregman identified "three transactions in which large blocks of Covista stock were actually sold or were authorized to be sold in the past twelve to eighteen months." Mem. Op. of Aug. 1, 2003, J.A. 2005. Therefore,

17

one of the sales relied on by Bregman was approved by the Covista Board of Directors but was not ultimately consummated. The Borrowers offer no reason to conclude that reliance on this "approved" transaction clearly undermines Bregman's actual sales valuation. Accordingly, we find no clear error in the district court's adoption of Bregman's actual sales valuation as a guide to determine Burns's damages.

V.

Finding no merit in any of the grounds raised by Appellants, we affirm.

<u>AFFIRMED</u>

18